[No. 681.  Decided May 24, 1893.]

THE CITY OF SEATTLE, *Appellant*, v. COLUMBIA & PUGET SOUND RAILROAD COMPANY, AND NORTHERN PACIFIC & PUGET SOUND SHORE RAILROAD COMPANY, *Respondents*.

MUNICIPAL CORPORATIONS — FRANCHISE FOR RIGHT-OF-WAY OVER STREETS — ESTOPPEL — CHANGE OF GRADE — PERPETUAL GRANT.

Where the city of Seattle has laid out a street over tide land, and granted a railway company the right to lay tracks thereon, by virtue of provisions contained in the charter conferred upon the city by the territorial legislature, and its acts in exercising such power have been subsequently confirmed by the provision of the state constitution authorizing cities to extend their streets over tide lands, such city is estopped to dispute the validity of the franchise granted the railway company, on the ground of want of authority in the city to grant the right-of-way.

Although an ordinance of a city granting a railway company a right-of-way over a certain street may impose a condition that the railway must be constructed within a certain time, yet the city is estopped to urge that the grant is void by reason of a failure to comply with such conditions, when the ordinance has never been

repealed and the city has permitted the railway company to continuously operate its road for several years.

A municipal corporation has no right to make such a change in a street grade as will effect a destruction of the franchise theretofore granted a railway company to lay its tracks therein.

A municipal corporation may grant a perpetual franchise for a right-of-way over its streets.

*Appeal from Superior Court, King County.*

*George Donworth* (*Burke, Shepard & Woods*, of counsel), for appellant.

*Ashton & Chapman*, and *Andrew F. Burleigh*, for respondents.

The opinion of the court was delivered by

Scott, J.—On the 14th day of March, 1882, the city of Seattle passed an ordinance purporting to grant a right-of-way to the Oregon & Transcontinental Railroad Company and the Columbia & Puget Sound Railroad Company to lay a single or double track along and upon certain streets therein described. The first section, describing the route, was amended October 29, 1883. The second section, omitting the seventh subdivision, which provided for the joint use of such tracks by any other railroad company constructing a railroad to Seattle, and provided a method of determining compensation therefor, is as follows:

"That said Oregon & Transcontinental Railroad Company and the Columbia & Puget Sound Railroad Company be and are authorized to locate, lay down, and perpetually maintain and operate a single or double track railroad upon the track and place described in section one of this ordinance, upon the following terms, to wit:

"*First:* That the said companies, their successors and assigns, are to allow each wharf owner a side track connecting the said road with the warehouses of each wharf owner, the side track to be constructed and kept in repair by the wharf owners or occupants along said water front.

"*Second:* That the rights so granted shall not in any way be construed as depriving the occupants of lots along said water front of any riparian rights or any rights, except so far as such way extends. The said owners and occupants reserve the right to wharf out in front of said railroad, and it is agreed that they shall have that right without objection by, or on the part of, said railroad companies, their successors or assigns.

"*Third:* The said road to be constructed by the railroad companies so as to be on a common level with the wharves along said water front.

"*Fourth:* That said companies, their successors and assigns, where said track crosses a wharf now or hereafter to be constructed, shall plank and keep in repair at least fifteen feet of said way, and, whenever a double track is constructed over said way, then the company or companies constructing or operating the same shall plank and keep in repair the entire way over said wharves, and the same may be used by the wharf owners at all times except when trains are passing over it.

"*Fifth:* That said railroad companies, their successors and assigns, shall not allow their cars to stand upon the track on any wharf along said water front without the consent of the owner of such wharf.

"*Sixth:* That said Oregon & Transcontinental Railroad Company is to construct a standard gauge railroad from Seattle to a point on the Northern Pacific Railroad Company's constructed line, so as to connect the city of Seattle with Eastern Washington, either by way of Portland, Oregon, or the Cascade mountains, within two (2) years; and, on failure so to do, this right herein granted shall be void and of no effect: *Provided,* That, if any other road shall construct a standard gauge road connecting Seattle with Eastern Washington before the roads above mentioned, then and in such case the rights herein to lay, maintain and operate such tracks be, and the same are hereby, granted to the road that shall so construct such line."

"*Eighth:* That said companies, their successors or assigns, shall not run trains over said tracks along said water front at a higher rate of speed than six miles an hour, and the city shall retain the same control over the streets and

alleys wherein the said tracks are laid [as] on and across
streets and alleys upon the land.''

In the latter part of 1883, the Puget Sound Shore Rail-
road Company, which was the predecessor of the Northern
Pacific & Puget Sound Shore Railroad Company, and which
claimed to have succeeded to the rights of the Oregon &
Transcontinental Railroad Company, aforesaid, constructed
a railroad of standard gauge from Seattle to Stuck Junc-
tion, a point on the Northern Pacific Railroad Company's
line, thereby connecting the city of Seattle with Eastern
Washington, then via Portland, Oregon, with a continuous
line of railroad.    This road was constructed within the time
specified.  It started from a point within the southern limits
of said city of Seattle, but did not cover any part of the
right-of-way described in said ordinance.    This road was
operated for about one month after completion, but thence-
forth for a year and a half no trains were run thereover.
A three-rail track (the Columbia & Puget Sound Railroad
being a narrow gauge road) was also constructed by the
Columbia & Puget Sound Railroad Company and the Puget
Sound Shore Railroad Company along the right-of-way de-
scribed in said ordinance, which is now in controversy, but
a gap of one rail's length was left at the point where the
standard gauge track was designed to connect with the line
constructed as aforesaid.    After the expiration of this
period of one year and a half, during which the road afore-
said was not operated, the connection was made, and a
continuous line was thenceforth operated continuously for
several years, until June 6, 1889, when a great fire de-
stroyed the railroad on said right-of-way, together with a
vast amount of other property in the vicinity.    The rail-
road companies at once set about restoring the wharves
and warehouses, etc., and the railroad tracks on said right-
of-way.    When they reached Columbia street, building
north, they found that the city had raised the grade of

that street at the point of crossing about two feet, and had filled in the street to conform therewith.  On August 21, 1889, when the railroad companies were proceeding to build across the street on the wharf-level grade as before, and were cutting the embankment the city had placed in front of them, this action was commenced, and a temporary restraining order was issued and served, restraining them from prosecuting the reconstruction of their tracks across Columbia street.  Various attempts were made to dissolve this order, but without success, so that the respondents have not been able to reconstruct said tracks north of the south line of Columbia street by reason of these proceedings.  Upon the final trial, the court below decided the cause in favor of the defendants, but ordered that the respondents should gain no advantage of the decision, provided the city should, within thirty days, prosecute an appeal, which it has done.  Therefore, all matters remain in *statu quo* as of August 21, 1889.

The right-of-way in controversy is located upon tide and shore lands, a part of it being within the meander line, and a part without.  The first five propositions contended for by appellant relate to the right of the city to maintain and control a public street on the shore land prior to the erection of the Territory of Washington into a state, to extend the streets in question thereon, and to the enactment of the ordinance establishing the higher grade of Columbia street after the destruction of the railroad at such point by fire as aforesaid.  For the purposes of this case, these propositions will be taken as established.  The remaining points contended for by appellant are as follows:

"6.  Ordinance No. 262 (as amended by ordinance No. 484), purporting to grant a franchise to build and operate a railroad, is void, by reason of the non-existence of the Oregon & Transcontinental Railroad Company, one of the grantees named — *First*, in respect to the defendant Columbia & Puget Sound Railroad Company, the other grantee;

and also, *second*, in respect to the defendant Puget Sound Shore Railroad Company, which joined with the last-named grantee in building the road; and, *third*, in respect to said defendants jointly; and, *fourth*, said franchise was also void because in terms perpetual and irrevocable.

"7. Said ordinance is void by reason of non-compliance with the sixth condition therein specified, as to the time within which the road should be constructed to a connection with Eastern Washington, and by reason of failure continuously to operate the road when constructed.

"8. Said ordinance was of no force in respect to the shore land, comprising the place to which the injunction sought relates, because the city, at the date of the ordinance, had no power to dispose of or incumber the shore; and the city is not estopped, by its subsequently acquired title to the *locus in quo* as a street, from denying its former power to make the grant.

"9. Assuming, however, that the defendants have the franchise claimed under the ordinance, the city's right of control over the street at the point of crossing was paramount, and could be exercised, when the injunction was sought, as the city might see fit, though the result might be the impairment or even destruction of the defendants' franchise; the sole remedy of the defendants, if any, being an action for damages.

"10. Even if the city's right of control over the street could not be exercised to the destruction of the defendants' franchise, its exercise in this case would not work a destruction of the franchise, apart from the change of grade of other streets crossing the railroad; and such change of other streets was not properly proved, and, if proved, was irrelevant under the pleadings."

The order in which the points have been stated will not be followed in the discussion, but the proposition in relation to the want of authority in the city to grant the right-of-way in question, stated in its eighth ground, will be first noticed. The right to authorize railroad companies to lay their tracks upon the streets and public places in the city generally was expressly conferred by law. Section 11 of

the charter of the city of Seattle, in force at the time, to be found at page 243 of the Session Laws of 1885–86, is as follows:

"The city of Seattle has power to provide for the survey of the blocks and streets of the city, and for making and establishing the boundary lines of such blocks and streets, and to establish the grades of all streets within the city, and to lay off, widen, straighten, narrow, change, extend, vacate and establish streets, highways, alleys and all public grounds, and to provide for the condemnation of such real estate as may be necessary for such purposes, and to levy and collect assessments upon all property benefited by any change or improvement authorized by this section, sufficient to make compensation for all property condemned or damaged; and to authorize or forbid the location and laying down of tracks for railways and street railways on any and all streets and alleys and public places within the city: *Provided*, That no street or alley shall be extended or vacated except by a vote of six members of the council in favor thereof: *And provided further*, That any person or corporation laying down such railway shall be liable to the owners of property abutting upon such streets, alley or alleys, for all damages or injury caused thereby, to be ascertained on the petition of the property owners, in the manner provided by chapter 188, §§ 2473 to 2576, inclusive, of the Code of Washington of 1881; and the judgment and decree thereon shall be that the company or persons shall pay such damages, and, on such payment, shall be entitled to such right-of-way, and, if no petition for such compensation shall be filed within two years after the track is so laid, such claim shall be barred."

There are several sections contained in the Code of 1881 also relating to this subject matter, which are as follows:

"SEC. 2458. When it shall be necessary or convenient in the location of any road herein mentioned to appropriate any part of any public road, street or alley or public grounds, the county court of the county wherein such road, street, alley or public grounds may be, unless the same be within the corporate limits of a municipal corporation, is

25—6 WASH.

authorized to agree with the corporation constructing the road, upon the extent, terms and conditions upon which the same may be appropriated or used and occupied by such corporation, and if such parties shall be unable to agree thereon, such corporation may appropriate so much thereof as may be necessary and convenient, in the location and construction of said road.

"Sec. 2459. Whenever a private corporation is authorized to appropriate any public highway or grounds, as mentioned in the last section, if the same be within the limits of any town, whether incorporated or not, such corporation shall locate their road upon such particular road, street or alley, or public grounds, within such town, as the local authorities mentioned in the last section, and having charge thereof, shall designate; but if such local authorities shall fail or refuse to make such designation within a reasonable time, when requested, such corporation may make such appropriation without reference thereto."

These are now §§ 1574 and 1575, vol. 1, of the present code.

While it is admitted that the city had the right generally to allow railroad companies to lay tracks upon its streets, it is contended that it had no such right where such streets were located upon tide lands, because the title thereto was in the territory in trust for the future state, and, therefore, that the city could not burden the same with any easement. It is contended, however, that the city had the right to occupy such lands for street purposes, and, although we have taken this contention as established, it may be well to notice some of the provisions of the city charter relating thereto. Section 11, as we have seen, confers power to lay off, establish and extend streets, etc., and establish the grades thereof. Section 26 confers power to build, construct and regulate wharves, piers and landing places at the foot of any street terminating at the shore of Elliott bay, and to regulate and prescribe the limits of the extension of wharves into the waters of any harbors within the

city limits. And § 1 defines the limits of the city as ex-tending on the westward to the center of Elliott bay. Thus it will be seen that the city had as full and complete rights in the premises as could have been granted by the terri-torial legislature, and this grant was valid and binding, ex-cepting as against the future state, and until it should take some steps to annul such action, subject, of course, to such restraints as should be imposed by the general government in its control of such waters. The city's exercise of the power so granted by the territorial legislature was never interfered with in the premises, but its acts thereunder have been expressly confirmed by virtue of the grant of power in § 3, art. 15 of the state constitution, authorizing the city to extend its streets over intervening tide lands to the har-bor area there provided for. We know of no reason why the city could not authorize the laying of railway tracks upon streets located upon tide and shore lands. We see nothing in the way of its granting whatever rights it did have in the premises. The very right to occupy shore and tide lands for street purposes would carry with it during such time at least the full enjoyment of all privileges that the city exercised with regard to its other streets, and one of these was the right to authorize the location of railway tracks upon its streets. This seems to us to have been as much within the policy of the law as was the recognition of the right to use such lands for street purposes in any wise. The city undertook to, and did, as far as it was able, confer this privilege on the respondents. Its acts have never been in any wise questioned, excepting in this instance, where it undertakes to set up its own want of power. But it sought to exercise the power, and its right so to do was not interfered with by any higher au-thority, but, on the contrary, was subsequently confirmed; and we are of the opinion that the city is in no position to urge the invalidity of the franchise, or its want of power

to grant the same, under the circumstances, nor can it ar-
bitrarily repeal the same, whatever rights it may have in
the exercise of the power of eminent domain.

We are also of the opinion that the city is not in a po-
sition to urge that the ordinance is void by reason of a
noncompliance with the sixth condition as to the time
within which the railroad should be constructed, nor of the
failure to continuously operate the road when constructed.
The essential object of the ordinance was to secure continu-
ous railway connection with the eastern part of the state, and
for that purpose the ordinance, by a proviso in said condi-
tion, purported to confer or convey the right to lay a track
upon the right-of-way in question to any company which
should first construct a standard gauge railroad affording
such connection.    There was no intention to limit the privi-
leges authorized to the particular corporations named, and
while it is admitted that the road was not constructed from
the point in controversy within the time specified, and that
for a year and a half from about a month after its completion
it was not operated, and thus, as appellant contends, the
spirit of the ordinance was violated, yet, notwithstanding
this, the ordinance was not repealed, nor was any step
taken during said time to compel the railroad companies
to remove their tracks from the streets in question, but
they were allowed to remain there, and finally the line was
put in operation, and was operated continuously for several
years prior to the institution of this suit.    The respond-
ents' rights in the premises were in no wise questioned
during said times, and, conceding that the city had the
right to impose the time limitation condition, we are of the
opinion that it is now, and was at the time of the institu-
tion of this suit, estopped from availing itself of the same
under the circumstances.

It seems to us that the contention of the respondents is
well founded, that the ordinance in question, while it re-

mained upon the books as one of the ordinances of said city, had the effect of designating the route where the line of railway might be constructed by any company choosing to build a standard gauge road thereon connecting said city by rail with Eastern Washington, and that, by constructing its line of railway thereon, respondents acquired a right as against the city to use such streets for such purpose, subject of course, to the reasonable control and regulation of the municipal authorities.

As to the sixth proposition: The point that there was no such corporation in existence as the Oregon & Transcontinental Railroad Company seems to us immaterial. It does appear that there was a corporation known as the "Oregon Transcontinental Company," and we think it fairly appears from the proof that this was the corporation that was intended to be designated, instead of the "Oregon & Transcontinental Railroad Company," which had no existence, and that it was, in effect, simply a misnomer; but, under the view we have taken of the points heretofore discussed, this matter becomes unimportant.

The point in relation to the franchise being void, because in terms perpetual and irrevocable, will be further noticed. What has been said disposes of the sixth, seventh and eighth propositions otherwise.

Many of appellant's statements advanced in support of its ninth ground are unquestionably sound, but they fail to sustain the position taken. A city's power to improve and graduate its streets is undoubtedly a continuant power, not exhausted by its first exercise, and inalienable by the corporate authorities, and such authorities are the ones to judge of the expediency or necessity of its exercise. This is well sustained by the cases cited. But the next statement, that under this power the city's right to establish and execute a new and higher grade of Columbia street at the place in dispute follows as a matter of course, must be

taken with some degree of limitation.    It will aid in the
discussion of this question to state our views here of the
effect of the city's action in the premises.    The raising of
the grade of the railway tracks two feet at the point in
question would greatly impair the usefulness of the tracks.
This clearly appears from the proof, and it also appears
that at the same time the city raised the grades of other
streets in the vicinity which were crossed by the railroad
tracks aforesaid to such an extent as to make it impossible
for the railroad companies to reconstruct their tracks upon
said right-of-way.    The effect of the raising of the grades
of these various streets was such as to absolutely destroy
the franchise, let alone making it impossible for the rail-
road companies to comply with the ordinance in question,
in giving to each wharf owner a side track, and to construct
the tracks on a common level with the wharves along the
water front.    Under such a state of facts, we think the
well settled rule of law is that the city's right to graduate
its streets or alter the grades thereof is not an absolute
one, to be exercised at its option, regardless of its effect
upon others, but it is a power which must be reasonably
exercised with reference to the rights of parties interested.
It cannot be exercised to the extent of working a destruc-
tion of such a franchise previously granted.    This would
amount to an unauthorized taking of property; and none
of the cases cited by appellant, in our opinion, support
such contention, as none of them go to the extent of hold-
ing that the city may so alter and change the grades of its
streets as to work a destruction of a valuable property
under such circumstances, but the right to change the
grades of streets is sustained upon the ground that the
same may be done consistent with the preservation of rights
previously acquired by others; as in the case of *State v.
Mayor, etc., of Hoboken*, 41 N. J. Law, 71, which involved
the validity of an ordinance requiring a horse railway to

make its tracks previously laid conform to the grade of the street, in which case it is said that —

"The provisions in these ordinances, requiring the tracks to conform to grade, and to be laid under the direction of the street commissioner,   .   .   .   are of the character of regulations which may be adopted, and, if reasonable, are valid.    Such regulations do not appreciably interfere with the exercise of its franchise by a corporation having a franchise to use the public streets for its business;   .   .   .   and the legislature is presumed to have intended, when it authorized the use of the public streets for such purposes, that its grantee should hold its privileges subject to such regulations as are reasonably necessary for the common use of the streets, for the purposes of a street railway, and for ordinary travel."

Nor can we agree with the statement that there was in this case no taking of property by the alteration of such grades because, at the particular time the ordinances were passed, the railroad tracks had been destroyed by fire at the point in question, and, for that reason, there was no property there in existence to take.    The argument might apply with some force in case of the destruction of a structure which could be rebuilt as well to conform to one grade as another, and where there would only be a damaging, instead of a deprivation, of the right.    But the railroad tracks at this point must be rebuilt with reference to the established grade of the railroads of which they were a part. The part which merely crossed the street could not be segregated and looked at independently, for it was of no value, excepting as a part of the system, and could only be reconstructed practically upon the same grade as before; and this, as we have seen, was rendered impossible by the changes in the grades of the streets made as aforesaid.    Although the railway tracks across this street were destroyed by fire, the property of the companies still remained.    The property was the franchise — the right to use the street for

the purpose of constructing and operating tracks thereon. This was the material thing of value, and this was what was sought to be taken by the corporate authorities in the manner aforesaid, and it was just as much of a taking as though the tracks had been actually in existence at the time the ordinances were adopted. The property of railroad companies is as much within the protection of the law as that of any other company or of any individual. Railroads are recognized as essential to the welfare and prosperity of the people, and, because of their capacity for usefulness to the whole people, railroad companies are invested with large powers of a public nature. The laws of the state also provide for the organization of cities, and large powers are granted to them relating to the control and regulation of matters within the municipal limits; but, when a broad interpretation of such powers clashes with acquired property rights, as in this instance, such reasonable construction should be given them as shall not have the effect of destroying, or even materially injuring, such rights. The city must so use its powers as to enable the respondents to have a reasonable use and enjoyment of theirs, and not so as to render it impossible or even very difficult for the respondents to reconstruct and operate their railroads. 1 Rorer, Railroads, p. 553, par. 13. Property rights acquired under and by virtue of franchises thus granted are perpetual, unless otherwise limited in the grant; and there was no limit in this instance, and such franchises are not void in consequence thereof. There is no sound reason why a municipal corporation may not bind itself in this particular, as well as an individual may. On the contrary, well recognized principles of justice require that it should be so bound, to the end that property rights may be made stable and certain; and the municipality is sufficiently protected under such circumstances; for should it become necessary to thereafter undo the work, and terminate the rights granted,

and to take the property of the corporation acquired in pursuance and by virtue thereof, it may do so under the exercise of the power of eminent domain upon making compensation; and this is a sufficient protection for the rights of the city, and one which, at the same time, affords protection to the rights of the respondents. *State v. Noyes*, 47 Me. 189; *Port of Mobile v. Louisville, etc., R. R. Co.*, 84 Ala. 115 (4 South. Rep. 106).

The substance of the tenth point has been previously disposed of in the view taken that the acts of the city, if sustained, would work a destruction of the franchise. Minor points as to whether the proof was irrelevant under the pleadings are of no particular importance at this time. Where a full and fair trial has been had upon the merits, and this is apparent, little attention will be paid in an equity cause to technical points raised over the pleadings.

The judgment of the lower court is affirmed.

DUNBAR, C. J., and HOYT, STILES and ANDERS, JJ., concur.