OMAHA, LINCOLN & BEATRICE RAILWAY COMPANY, APPEL-
LEE, v. CITY OF LINCOLN, APPELLANT.

FILED OCTOBER 30, 1914.   No. 18,255.

1.  **Municipal Corporations:** CONTROL OF STREETS: USE BY RAILROADS.
    Section 5942, Rev. St. 1913, should not be construed to authorize
    a railway company to select any street of the city it may choose for
    its right of way, and obtain control thereof by condemnation pro-
    ceedings or by contract with the city.  The city cannot, by contract
    or in any other way, deprive itself of the power to control its
    streets and to establish and maintain the grades thereof.

2.  ———: ———.  The city authorities have control of its streets,
    and have power "to compel railways to conform tracks to grades
    at any time established."  When the city has established the grade
    of a street, the courts will not interfere with such action unless it
    clearly appears that thereby the rights of others have been seriously
    injured, and that such injuries are so wholly unnecessary that no
    reasonable mind could entertain a contrary belief.  The provisions
    of section 5942, Rev. St. 1913, do not alter this rule.

3.  ———: ———: GRADING: INJUNCTION.  It is the duty of the city
    authorities, with the assistance of their engineers, to plan and
    adopt a sewerage system.  When the evidence is conflicting as to
    the advisability and practical working of the system planned and
    adopted by the proper authorities, the courts will not enjoin the
    grading and paving of the streets pursuant to that plan, nor
    restrain the city authorities from requiring railway tracks along
    such streets to conform to such grade, on the ground that the
    streets and adjacent properties will not be properly drained.

4.  ———: STREETS: USE BY RAILROAD: CONFORMITY TO GRADE.  When
    a city of the first class, having more than 40,000 and less than
    100,000 inhabitants, enacts an ordinance granting a railway com-
    pany the right to construct its road in a street of the city, and
    provides in that ordinance that the railway company shall con-
    form its tracks to grade then existing or that shall afterwards
    be established, and afterwards enacts an ordinance establishing for
    the first time the grade of the street upon which the tracks have
    been laid pursuant to the first ordinance, no other ordinance
    requiring the railway company to conform its tracks to the grade
    so established is necessary.

APPEAL from the district court for Lancaster county:
ALBERT J. CORNISH, JUDGE.  *Reversed and dismissed.*

*F. C. Foster* and *D. H. McClenahan,* for appellant.

*C. C. Flansburg* and *Leonard A. Flansburg, contra.*

*T. S. Allen, amicus curiæ.*

SEDGWICK, J.

In March, 1904, the city of Lincoln enacted an ordinance granting to this plaintiff, the Omaha, Lincoln & Beatrice Railway Company, the right to use Y street in the city of Lincoln for its tracks. The ordinance required the plaintiff to pay an annual occupation tax, and to conform its tracks to the grades which were then established or which might thereafter be established, and to accept in writing the ordinance as a contract, and give bond in the sum of $10,000, guaranteeing a compliance with the terms of the ordinance. The ordinance was duly accepted by the plaintiff and the bond given. At that time no grade had been established on Y street between Eighteenth and Twenty-seventh streets, and the maps and profiles filed by the plaintiff with the city authorities showed an elevation of its tracks at Twenty-first and Y streets of 1 7/10 feet above the natural grade. The plaintiff then filled the right of way at Twenty-first and Y streets about 16 inches above the natural grade and constructed its road accordingly. In August, 1911, the city council enacted an ordinance which provided for the paving of Y street from Twenty-first to Twenty-seventh streets and by ordinance established the grade thereon. The grade so established was about an inch above the natural grade of the street, but the ordinance contained no provision requiring the plaintiff to lower its tracks to conform with the grade so established. Afterwards, in May, 1912, the council ordered the street paved, and the contract for paving the street was entered into by the city with the Ford Paving Company on August 19, 1912. Pursuant to the contract the contractor began the work of paving the street and paved Twenty-first street from the south to the south side of Y street. On the 21st of October, 1912, the plaintiff filed a petition in the district court for Lancaster county against

the city and the contractor, asking for an injunction restraining the defendants "from interfering with the rails, ties, or grade of plaintiff's said railway on said Y street," and from interfering with the operation of the plaintiff's railway over and upon said Y street. Summons thereon was served on the 23d day of October. No temporary injunction was allowed or asked for. A motion was filed by the defendant on the last day of December, 1912, to require the plaintiff to attach to its petition a copy of the alleged agreement between the plaintiff and the city. There was no ruling upon the motion, and, the attorneys who had begun the action for the plaintiff having withdrawn from the case, other attorneys filed an amended petition in April, 1913. This petition asked for a temporary injunction against the defendant, but it does not appear that the same was allowed or that any hearing was had upon the application. A general demurrer was filed to this amended petition, which was overruled, and the city filed an answer immediately. Thereupon still another attorney, who had been employed by the plaintiff, filed a second amended petition, which also asked for a temporary injunction, but the case immediately proceeded to trial and no temporary injunction was allowed. On the 26th day of May, 1913, the district court made special findings and entered a decree enjoining the defendant, the city of Lincoln, substantially as prayed, and the defendant has appealed.

The court found that Y street from Eighteenth to Twenty-third street is low ground and subject to overflows from flood-waters, and especially from back-waters from the Antelope creek, and that the plaintiff's tracks have been interfered with at times thereby; that the plaintiff, relying upon the profile and its right to maintain the elevation as shown therein, constructed its road and tracks, and has been operating the road and serving a portion of the city and the outlying districts, carrying 1,100 passengers a day, and that the track is in the "low pocket in the Antelope valley between Twenty-second and Twenty-third streets, west to beyond Twenty-first street, is boggy and

marshy," and that plaintiff's track is some 18 inches above the natural surface of the ground, and the plaintiff has placed cinders and other material under the ties in the embankment and roadway, and that the street has been little used for travel except on plaintiff's trains; that the track of the Missouri Pacific Railway crosses Eighteenth street, and that the elevation of their tracks has not been fixed or established by any ordinance, and they have not been required by ordinance to conform to the established grade, and their tracks are several feet above the natural surface and the established grade of the street; that the ordinance, enacted in March, 1910, would require the lowering of plaintiff's tracks in the intersection of Twenty-first and Twenty-second streets with Y street about 18 inches, "to the natural surface of Y street at said intersection;" that the ordinance establishing the grade of Y street will make that street the lowest street "from Dudley on the north and X street on the south, and will cause the surface waters to flow into said Y street," and that to compel the plaintiff to bring its track down to the proposed grade "will remove and destroy the foundation for its embankment," and that a large proportion of the property owners, some 40 in number, abutting on or adjacent to said street have protested against the lowering or fixing of the grade below the profile and elevation of plaintiff's tracks.

Of course, if the plaintiff constructs the paving between its rails as the law requires it will first lay a concrete foundation therefor, and so will not be damaged by substituting this foundation for the cinder foundation it now has. If the city can in ordinary cases only require a railway company to conform its tracks to grade by ordinance duly enacted, and if, after an ordinance is duly enacted, as in this case, fixing the grade and requiring the streets to be paved, a second ordinance is necessary to require the railway company to place its paving upon the grade, we have that second ordinance in this case, since the original franchise ordinance under which the plaintiff laid its tracks provides that the plaintiff shall conform its tracks

to the grades then existing or to be established, and there is a general ordinance of the city requiring this to be done. It would seem that no further ordinance of the city could possibly be necessary for that purpose.

The court also found that in seasons of freshet when waters collect it will be impossible to maintain and operate the track at such grade, and will prevent the operation of cars over and upon said track at such times, and that "no adequate provision has been made for taking care of said flood and surface waters, or securing their discharge from said track, and, by reason of said grade, no proper arrangement or sewer connection can be put into effect to carry off said water or relieve said flood condition, thereby rendering that portion of its roadbed useless at such times, depriving the people of its service; * * * that the establishment of the grade on Y street below the profile and elevation of the plaintiff's track will not benefit any one, and such grade is unnecessary, is contrary to the public interest," and that "the construction of the railroad aforesaid in accordance with the profile and the maintenance of its railroad with the approval and consent of the defendant vested in plaintiff the right to operate and maintain its said line of railway on the grade as established by said profile, and that said defendant city is estopped to question or interfere with the same, except for the public good and by an ordinance duly enacted; and the court finds that no ordinance whatever has been enacted by the city, instructing or directing the plaintiff to remove its track on said Y street to the established grade; and, by reason of the aforesaid, the plaintiff is entitled to a permanent injunction." These findings suggest the vital question in this case. There is no contention that to require the plaintiff to lower its tracks at Twenty-first street so as to conform to the established grade of the paving is in itself an unreasonable hardship. It is only because the plan of the drainage and sewerage system is supposed to be defective and because of the results anticipated in that respect that complaint is made.

"The power of the legislature to subserve the general welfare of the people by all needful and proper regulations in the interest of health and safety is inherent in the sovereignty of the state, and cannot be bartered away by contract or otherwise. Such power may be asserted directly by the legislature, or may, in the absence of constitutional restrictions upon the subject, be delegated to the several municipal corporations or other agencies provided for its exercise. The power of the legislature over private property is not absolute. But, while it cannot at will impose upon property burdens so excessive and unreasonable as to work a practical confiscation thereof, the courts will never interfere to prevent the enforcement of statutes on account of any mere difference of opinion between them and the lawmaking power of the government respecting the wisdom or necessity of particular measures." *Chicago, B. & Q. R. Co. v. State,* 47 Neb. 549. These principles are peculiarly applicable to the case at bar. This court cannot say as matter of law that, by establishing the grade of the proposed paving at the natural grade of the surface of the ground, the city authorities have exceeded their power, unless it so clearly appears that thereby the rights of others have been seriously injured and that such injuries were so wholly unnecessary that no reasonable mind could entertain a contrary belief. If the sewerage system is sufficient to carry off the water and substantially prevent it from accumulating on the plaintiff's tracks, as it is required to construct them, no substantial injury has been done the plaintiff. The case then resolves itself into the question as to the plan and construction of the drainage system.

The paving district organized by the ordinance, known as No. 217, includes Twenty-first street from Vine street to Y street, and Y street from Twenty-first to Twenty-seventh streets. The plaintiff's complaint is in regard to the conditions existing by the established grade at the intersection at Twenty-first and Twenty-second streets with Y street. At this point the established grade is only a fraction of a foot above the natural surface. The only evidence

on that point that we have found in the record is in the testimony of the assistant engineer, who testifies that it is from 1/10 to 4/10 of a foot above the natural surface. The tracks of the plaintiff, if the action of the city is upheld, will have to be lowered to about the natural surface at that point. It is contended by the plaintiff that the grade at that point is low, and ascends both toward the east and toward the west, thus forming a "pocket" at that place that will, in times of even ordinary rains, be filled with water so as to cover the tracks of the plaintiff, as well as a considerable section of the surrounding territory, and that this will be so great an injury to the plaintiff and to lot-owners as to make the action of the city in so establishing the grade so unreasonable as to be void. The plaintiff produced and examined five expert witnesses, and the case rested upon their testimony. The principal question investigated was whether the city had adopted a proper and feasible sewerage system for that locality. Mr. Towl, an engineer of some considerable experience, who is now employed in that capacity in the city of Omaha, and who examined the situation here on two different days before he testified, stated that the system adopted by the city in that locality is not practicable or feasible; that Y street at the intersection of Twenty-first street ought to be elevated, so as to make a continual slope from east to west. He stated his reasons and his conclusions quite at large, and his evidence no doubt seems quite plausible to a lawyer who is not an expert in those matters. His principal objection is to the openings into the sewer. He testifies that they are not large enough, not in the right shape, and are not properly located. His evidence is supported emphatically by Mr. Hicox, who seems to be a very competent engineer, and who looked the situation over just before he testified. He is also supported in a general way, but not so emphatically, by other competent engineers. On the other hand, Mr. Bates, the assistant city engineer of Lincoln, testified fully in regard to existing conditions, and in regard to the plan and conditions of the present system of sewerage, and also to some

extent as to proposed or contemplated changes and additions to the sewerage system. He has been in his present position as assistant engineer for some time, and shows in his evidence a thorough knowledge of the conditions existing and of the sewerage system as it is already constructed, as well as contemplated additions thereto. His evidence as to the elevations of the natural surface throughout that part of the city and of the established grade in question was very full and complete, and is the evidence upon these points in this case without contradiction. It appears from his evidence that the natural surface of Y street descends gradually from the east to Twenty-first street, and then rises for more than 200 feet. At 475 feet west of Twenty-first street the elevation is about three feet above Twenty-first street. This rise of ground, called a knoll in the evidence, extends about 100 feet north and about 200 feet south of Y street.

There is an 8-inch sanitary sewer on Y street at the crossing of Twenty-first street, and a 15-inch storm sewer, which empties into a 21-inch sewer about a half block west of Twenty-first street. This sewer continues west to Seventeenth street, and connects with the main sewer, which runs north to Salt creek. It also connects at Seventeenth street with an 18-inch sewer, which runs south 200 feet to Antelope creek. The fall of the sewer is one foot to a thousand. If the city authorities and the engineer are making the mistake that some of this evidence would indicate that they are making, it is indeed a very serious matter. If their sewerage system is wrongly planned and improperly constructed so as to unnecessarily overflow the paving of this street when completed and cover the tracks of the plaintiff and the surrounding lots with water, and if these mistakes and defects cannot be remedied by the city, it would seem that such a construction would subject the city to damages that it is well worth while for the authorities to pause and consider.

In *City of Seattle v. Columbia & P. S. R. Co.*, 6 Wash. 379, the supreme court of that state, after stating the

97 Neb. 9

facts in the case, said: "Under such a state of facts, we think the well-settled rule of law is that the city's right to graduate its streets or alter the grades thereof is not an absolute one, to be exercised at its option, regardless of its effect upon others, but it is a power which must be reasonably exercised with reference to the rights of parties interested." In that case the city raised the grade of the street where the railroad company's tracks were located to such an extent, as stated by the court in the opinion, "as to absolutely destroy the franchise." The city raised the grade above the natural surface, and "at the same time the city raised the grades of other streets in the vicinity which were crossed by the railroad tracks aforesaid to such an extent as to make it impossible for the railroad companies to reconstruct their tracks upon said right of way." The purpose of the city appears to have been to compel the railroad company to entirely abandon its location, without providing any other location for its tracks.

There might be a case in which it could be so clearly demonstrated that the plan adopted was so absolutely impracticable that a court would be justified in interfering, but planning and adopting sewer systems is not a judicial matter, and the law leaves such matters to the city council as they may be advised and assisted by their engineers. If the property owners are damaged by the change of grade, the law affords them a remedy, but not by injunction. The evidence is conflicting as to the feasibility of the plan of drainage which the city had adopted. If it should prove inadequate, the mistake will undoubtedly be corrected and the damages caused thereby liquidated.

Section 5942, Rev. St. 1913, provides: "If it shall be necessary, in the location of any part of any railroad, to occupy any road, street, alley or public way or ground of any kind, or any part thereof," the public authorities and the company may "agree upon the manner and upon the terms and conditions upon which the same may be used or occupied; and if such parties shall be unable to agree thereon, and it shall be necessary, in the judgment of the directors of such railroad company, to use or occupy such

road, street, alley or other public way or ground, such company may appropriate" the same by condemnation. The plaintiff construes this statute in these words: "If no contract had been made at that time, plaintiff could, by condemnation proceedings, have taken so much of Y street as was necessary, upon making compensation to the city and abutting owners, and as thus condemned, under the statute quoted, and so far as it took for its own purposes, the city would lose the power or control of the location of the road and its grade."

Plaintiff says: "Even now plaintiff (if it cannot 'agree' with the city) can condemn and maintain its tracks at the elevation sought, under the statutes of the state, although the physical conditions were not sufficient to justify the maintenance of its present elevation. Wherever an elevation is reasonably necessary for the maintenance and operation of the road, that elevation may be secured, first, by contract, if possible, but, failing, in that, by condemnation. For, when plaintiff has once condemned a right of way in the street and paid for that right, the city is powerless to prevent the maintenance of the very right it has paid to secure; and its right under the contract is precisely the same. The purpose of this legislation was to confer added power upon the municipality. Without it, the city could have regulated the entrance of a railroad and the occupation of its streets, over which it had full control. The legislature therefore intended that the city should have power by 'agreement' to surrender control of the streets, or, failing to agree, the railroad should have the right to condemn, regardless of the city's control. The statute therefore authorized the city to surrender its control."

It seems strange that any one should so construe the statute. Can it be supposed that a railway company can select any street of a city it may choose and by condemnation or any other process obtain control thereof? Can it place any tracks and grades therein it may see fit, and maintain them? The city under the statutes has entire control of the streets. If the statute authorizing condem-

nation of a street by a railway company means anything more than to give it the means of having the pecuniary damage to the city and property owners fairly adjusted when agreement is impossible, it cannot, when considered with other statutes, or when considered in the light of the general policy of the state, be intended to allow a railway company to select at will the street or streets of a city upon which it will lay its tracks, or to give it any right in any street, except subject to the control and regulation of the city, and subject to the equal right of the public in the use of the street.

The statute also provides that the city shall have power: "To regulate levees, depots, depot grounds and places for storing freight and goods, and provide for and regulate the passing of railways through the streets and public grounds of the city, reserving the rights of all persons injured thereby." Rev. St. 1913, sec. 4422.

"To compel railways to conform tracks to grades at any time established, and if lengthwise in a public way to keep them level with street surface, to compel railways to keep streets open, construct and keep in repair ditches, drains, sewers and culverts along or under their right of way or tracks, and lay and maintain paving of their whole right of way on paved streets." Section 4471.

"To make all such ordinances, by-laws, rules and regulations not inconsistent with the laws of the state as may be expedient, in addition to the special powers in this section granted, maintaining the peace, good government, and welfare of the city, its trade, commerce and manufacturies." Section 4473.

"The mayor and council shall have supervision and control of all public ways and public grounds within the city, and shall require the same to be kept open, in repair and free from nuisances." Section 4475.

"The mayor and council shall have power by ordinance to provide for grading or repairing of any street or public way, construction, renewal or repair of bridges, culverts and sewers." Section 4523.

Under these statutes a railway company cannot select any street of a city that it chooses and grade its tracks to any extent it may desire. The city has general control of its streets and of the grades thereof. It is not necessary to determine in this case the exact limits of the rights and powers of a railway company under section 5942. The franchise ordinance under which the plaintiff laid its tracks on Y street itself provides that the tracks shall conform to grades established or which might thereafter be established. Establishing the grade of Y street at or near the natural surface of the street is not necessarily unreasonable. That the plan of drainage adopted leaves Y street lower than adjoining streets does not necessarily make the plan impossible or impracticable. If the sewers already laid or contemplated are improperly constructed or are insufficient, it does not necessarily follow that these defects cannot be remedied. The presumption is that the city will provide ample drainage for its streets. We cannot say from this evidence that the plan adopted is so clearly impossible as to require the courts to interfere with the discretion and judgment of the city authorities.

The judgment of the district court is reversed and the cause dismissed.

REVERSED AND DISMISSED.

ROSE, J., not sitting.

BARNES, J., dissenting:

I cannot concur in the majority opinion. The findings contained therein and the evidence show beyond question that Y street from Eighteenth to Twenty-third is in low ground and is subject to occasional overflows from flood-waters, especially back-waters from Antelope creek, which have interfered with the operation of the plaintiff's track at that point; that, in reliance upon the profile and its right to maintain its track at the elevations shown thereby, it has extended its road beyond the city limits seven miles, has expended a large sum of money in so doing, and since 1906 has operated its road, serving a portion of the city and outlying districts not reached or served by any other

railway, and has been carrying about 1,100 passengers daily; that there is a low pocket at Twenty-first and Y streets which is boggy and marshy; that the plaintiff built its track across such marsh according to its profile, some 18 inches above the natural surface of the ground, and placed cinders and other material under the ties in the embankment and roadway to give it sufficient stability to make its operation safe and possible.

It further appears that fire hydrants have been inserted on Y street upon a grade level with the top of the plaintiff's track, and under the track is a sewer connection with manholes on a grade level with its surface; that Y street has been little used except for travel on plaintiff's trains; that the tracks of the Missouri Pacific Railway, on what would be X street if the same was opened, and those of the Chicago, Rock Island & Pacific Railway cross the plaintiff's tracks in a northerly direction along Eighteenth street a part of the way; and the elevations of said roads and tracks are not fixed or established by any ordinance, nor are said roads or the tracks of either of them required by ordinance to conform to the established grades of the streets where they intersect, but are several feet above the natural surface and the established grade of said streets; that the grade which requires the lowering of plaintiff's tracks 18 inches at the intersection at Twenty-first and Y streets will make Y street the lowest street from Dudley on the north to X street on the south, and will cause the surface waters to flow into and stand in Y street; that the defendant is about to interfere with the tracks of the plaintiff at Y street, and tear up and destroy and lower the same about 18 inches, and thus compel the plaintiff to bring its tracks down to the proposed grade, which will remove and destroy the foundation of the plaintiff's embankment; that in seasons of freshet when waters collect it will be impossible for the plaintiff to maintain and operate its track and railroad at such a grade.

It clearly appears that no adequate provision has been made for taking care of the flood and surface waters or securing their passage from plaintiff's track; that a por-

tion of the plaintiff's roadbed will thereby be rendered useless, and the public will be deprived of its train service; that the establishment of a grade on Y street 18 inches below the profile and elevation of the plaintiff's track will not benefit any one; that such grade is unnecessary, is contrary to the public interest, and a large portion of the property owners, some 42 in number, abutting on or adjacent to said street, have protested against the lowering or fixing of the grade below the profile and elevation of the plaintiff's tracks; that the defendant should be estopped to interfere with the plaintiff's grade, except for the public good and by an ordinance duly enacted in that behalf, and it appears that no ordinance whatever has been enacted by the city instructing or directing the plaintiff to lower its tracks on Y street to the grade thus established.

As I view the record, the foregoing facts are established by a preponderance of the evidence. The district court made certain findings which accord substantially with the foregoing, and I am unable to see how its findings could have been otherwise.

The supreme court of California in *Pacific Telephone & Telegraph Co. v. Eshleman,* 166 Cal. 640, 663, said: "But in the exercise of the police power in the regulation of public utilities, while each case which is rested upon the exercise of that power must be subject to its own individual consideration, there are certain fundamental principles which are not disputed and which govern all. The first of these is that this power goes merely to the *regulation* of the public utility, and that when an order passes beyond proper regulation it amounts to a taking of the property, and the order is then referable, not to the police power, but to the power of eminent domain. * * * Another principle, quite as important and quite as fundamental, is that 'taking' of property within the meaning of the constitution is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of its use."

The police power can never be exercised to do more than to regulate the owner's use, and cannot extend to the taking of his property from him or dispossessing him of its use and control. A street is for the use, convenience, comfort, and safety of all the people of the city—for all the users of it. Therefore, before the rights of the users of a city can be interfered with, there must be some necessity for the interference of the police power by the state. After enumerating the extent and authority of the police power, the supreme court of the United States in *Lawton v. Steele,* 152 U. S. 133, said: "To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. The facts of this case show that the plaintiff carries more than 1,100 passengers daily, not accessible to other roads; that the street is little used for travel or traffic aside from such use; that the interests of the public generally, as well as the abutting owners, have been disregarded and have not been considered; that the grade established at Twenty-first and Y streets will make a cesspool in floods and freshets. This is not only unduly oppressive upon individual lot-owners abutting upon said street, but upon the general public as well, and it is shown by the testimony that the accomplishment of that purpose is destructive and will defeat every purpose for which the paving is laid. The testimony discloses that to lower the grade of the plaintiff's railroad to the proposed street grade is an arbitrary interference with its private property. This should not be done under the guise of the exercise of police power.

In *City of Seattle v. Columbia & P. S. R. Co.,* 6 Wash. 379, the railroad was given the power of condemnation in

a public street, similar to that conferred upon railroads by the statutes of this state. The city of Seattle had authority to establish grades and regulate the laying of railways thereon, or to prohibit the same entirely. From the facts in that case it appeared that the railroad tracks had been destroyed by fire, and after such destruction the city undertook to raise the grade of the street. The court, in speaking of the power to improve and grade streets, said: "A city's power to improve and graduate its streets is undoubtedly a continuant power, not exhausted by its first exercise, and inalienable by the corporate authorities, and such authorities are the ones to judge of the expediency or necessity of its exercise. * * * That under this power the city's right to establish and execute a new and higher grade on Columbia street at the place in dispute follows as a matter of course must be taken with some degree of limitation." The court after saying that the raising of the grade would greatly impair the usefulness of the tracks, and thereby destroy the franchise and make it impossible for the railroad company to perform certain duties imposed upon it, the opinion proceeds as follows: "Under such a state of facts, we think the well-settled rule of law is that the city's right to graduate its streets or alter the grades thereof is not an absolute one, to be exercised at its option, regardless of its effect upon others, but it is a power which must be reasonably exercised with reference to the rights of parties interested. It cannot be exercised to the extent of working a destruction of such a franchise previously granted. This would amount to an unauthorized taking of property; and none of the cases cited by appellant, in our opinion, support such contention, as none of them go to the extent of holding that the city may so alter and change the grades of its streets as to work a destruction of a valuable property under such circumstances, but the right to change the grades of streets is sustained upon the ground that the same may be done consistent with the preservation of rights previously acquired by others."

In *Houston & T. C. R. Co. v. City of Dallas*, 98 Tex. 396, 419, 70 L. R. A. 850, 863, the court sums up the question

as follows: "If it be true that there is to be no benefit to the public from the proposed change, or a benefit which is inconsiderable when compared with the detriment to be suffered by the respondent, who will say that it is just and reasonable to subject respondent to such expense and loss as is averred?  *  *  *  When it is found that a proposed action is to be fraught with such consequences as those averred in the answer, a public exigency correspondingly great and urgent should be required in its support."

It is said in the majority opinion that the city had no power, by contract or otherwise, to alienate its right of control over its streets. It must be remembered, however, that, when the plaintiff sought to enter the city of Lincoln with its railroad and construct its tracks therein, the statutes of this state gave the plaintiff the right to condemn its right of way through the streets of the city in case no agreement in relation thereto could be made with the city council. Recognizing this fact, the council entered into an agreement with the plaintiff by which it was authorized to construct its tracks along Y street, and while the city could not, by contract or otherwise, wholly abandon its right to the control of its public street, still it had the power to contract with relation to the reasonable use thereof, and, having entered into such a contract, it should be required to abide by its terms, unless there has been a change of conditions such as requires it to abrogate the contract and resume the exercise of its power of control over the street in question.

As I view the record, no such public necessity has been shown, and it not appearing that the district court erred in its findings and decree, but on the contrary it appearing by the findings set forth in the majority opinion, and by the undisputed evidence, that the judgment of the district court was right, I am of opinion it should be affirmed.