(87 Misc. Rep. 365)

WARD, Commissioner of Public Works, v. ERIE R. CO.

(Supreme Court, Special Term, Erie County. November 7, 1914.)

1. RAILROADS (§ 95*)—STREET CROSSINGS—GRANT OF RIGHT TO USE—CONSTRUCTION—VIADUCT.

A resolution granting permission to a railroad company to construct its road across city streets, "subject to the future control and pleasure of the common council * * * with respect to said crossings," did not reserve any right in the council to require the construction or maintenance of such a viaduct as the subsequent development of the city made necessary.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*]

2. RAILROADS (§ 93*)—RIGHT TO CROSS STREETS—LIMITATIONS.

The right conferred on a railroad company incorporated under Laws 1850, c. 140, to construct its tracks with a city's assent across a city street, being derived from the Legislature and not from the city, was subject to no limitations imposed by the city and not prescribed in such statute, or at least to no limitation not imposed by the city as a condition to the original giving of its assent.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 260–265; Dec. Dig. § 93.*]

3. RAILROADS (§ 93*)—RIGHT TO CROSS STREETS—REVOCATION.

The right of a railroad company incorporated under Laws 1850, c. 140, to construct its tracks across a city street subject to the assent of the city, becomes absolute on such assent being obtained, and cannot be revoked by the city.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 260–265; Dec. Dig. § 93.*]

4. RAILROADS (§ 113*)—OBSTRUCTION OF STREETS—RAILROADS—"PUBLIC NUISANCE."

Only such obstructions of a street by the construction of a railroad across it as, are unnecessary to the exercise of the easement of the general public in the railroad constitute a "public nuisance."

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 230, 351–357, 359–361, 363, 364; Dec. Dig. § 113.*

For other definitions, see Words and Phrases, First and Second Series, Public Nuisance.]

5. RAILROADS (§ 95*)—REGULATION—STREET CROSSINGS—LEGISLATIVE AND MUNICIPAL POWERS.

Where the Legislature has granted a railroad company the right to construct its tracks across city streets, subject to the assent of the city, on condition that it shall replace the streets in such a manner as not to unnecessarily impair their usefulness, it may subsequently impose further conditions on the company as a condition to the exercise of such right; but the city cannot subsequently compel the company to maintain a viaduct over its tracks.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*]

6. RAILROADS (§ 95*) — CROSSINGS — COST OF MAINTENANCE — LEGISLATIVE POWER—"PUBLIC HIGHWAY."

Since a railroad is a "public highway," the Legislature may adjust equitably between the railroad company and a city the expense of bringing about a normal condition from a condition impairing the safety of the traveling public on the railroad and on a street crossed by it: and hence Laws 1888, c. 345, and its subsequent amendment (Laws 1892, c. 353), which have such object and provide "for the relief of the city of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Buffalo and to change and regulate the crossing and occupation of the streets * * * by railroads," are valid.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*

For other definitions, see Words and Phrases, First and Second Series, Highway.]

7. CONTRACTS (§ 15*)—REQUISITES.
A meeting of minds is essential to the validity of a contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 61–66; Dec. Dig. § 15.*]

8. RAILROADS (§ 95*)—STREET CROSSINGS—CONTRACT WITH MUNICIPALITY—CONSIDERATION.
A contract between a railroad company, the predecessor of which was incorporated under Laws 1850, c. 140, and the city of Buffalo, binding the city for the repair and maintenance of a viaduct at a crossing of the tracks and a street, which contract was ratified by Laws 1911, c. 358, was not void for want of consideration, where the railroad company was compelled by the statute to eliminate the grade crossing and pay its proper share of the cost thereof.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*]

9. CONTRACTS (§ 50*)—"CONSIDERATION."
A "consideration" consists in some right, interest, profit, or benefit accruing to the party who makes the promise, or some forbearance, detriment, loss, responsibility, act, labor, or service given, suffered or undertaken by the other, to whom it is made.

[Ed. Note.—For other cases see Contracts, Cent. Dig. § 222; Dec. Dig. § 50.*

For other definitions, see Words and Phrases, First and Second Series, Consideration.]

10. RAILROADS (§ 95*)—CROSSING—EXPENSE OF MAINTENANCE—MUNICIPAL CORPORATIONS.
Since a contract between a railroad company incorporated under Laws 1850, c. 140, and the city of Buffalo, relieving the company from maintaining a viaduct at a crossing, added no burden not already imposed by law on the city, though the company's franchise bound it to maintain the crossing so as not unnecessarily to interfere with its usefulness, no invalidity of the contract could entitle the city to compel the railroad company to repair and maintain the viaduct.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*]

11. RAILROADS (§ 95*)—CROSSING—MAINTENANCE OF VIADUCT—CONTRACT—"PUBLIC POLICY."
A contract between a city and a railroad company incorporated under Laws 1850, c. 140, relieving the latter from the expense of maintaining a viaduct at a crossing, was not contrary to that "public policy" which is evidenced in the legislative acts and defined and applied in the decisions of the courts.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*

For other definitions, see Words and Phrases, First and Second Series, Public Policy.]

12. RAILROADS (§ 95*)—CROSSING—MAINTENANCE OF VIADUCT—STATUTE APPROVING CONTRACT—VALIDITY—DELEGATION OF LEGISLATIVE POWER.
Laws 1911, c. 358, § 15, approving contracts made by the grade crossing commissioners of the city of Buffalo with railroad companies, is not invalid as contracting away the police power of the state, though a con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tract thus approved purported to relieve a railroad company from the burden of maintaining a viaduct, since the obligation to maintain such viaduct rested on the municipality before execution of such contract.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 274–283; Dec. Dig. § 95.*]

Application for mandamus by Francis G. Ward, as Commissioner of Public Works of the City of Buffalo, against the Erie Railroad Company. Application denied.

William S. Rann, Corp. Counsel, and Jeremiah J. Hurley, both of Buffalo, for petitioner.

William L. Marcy, Helen Z. M. Rodgers, and Alfred L. Becker, all of Buffalo, for respondent.

WOODWARD, J. The city of Buffalo, through its commissioner of public works, seeks a peremptory writ of mandamus to compel the Erie Railroad Company to repair and maintain the bridge or viaduct carrying Chicago street over its tracks in that city; it being contended on the part of the city of Buffalo that the provisions of a certain contract made between the grade crossing commissioners and the Erie Railroad Company, by which the latter company was relieved of the burden of maintaining such bridge or viaduct, is void as being without consideration, against public policy, and an attempt to contract away the governmental power of the Legislature and the people to maintain public highways across the railroad for the accommodation, safety, and general welfare of the people. It is insisted that no power was given to the commissioners to make a contract binding upon the city of Buffalo for the future repairs and maintenance of this bridge or viaduct, and that the act of the Legislature (chapter 358 of the Laws of 1911), purporting to affirm and ratify all acts and contracts of the commissioners, does not give life and validity to the original contract.

[1] No suggestion is made that this is not a proper question to be determined upon an application for a peremptory writ of mandamus, and, without entering upon a discussion of the rules governing such proceedings, we will deal with the merits of the question presented. As a preliminary thereto it may be proper to clear away some of the incidental matters. It will be assumed, for the purposes of this proceeding, that the predecessor of the Erie Railroad Company was incorporated under the provisions of chapter 140 of the Laws of 1850, although this is disputed by the respondent, and that Chicago street was a public highway within the city of Buffalo prior to the incorporation of such company. This being true, it became necessary to the right of the Buffalo & New York City Railroad Company (such predecessor) to cross Chicago street that it have the assent of the common council of the city of Buffalo. Subdivision 5, § 28, c. 140, Laws of 1850. It is conceded that by the provisions of chapter 132 of the Laws of 1843 the common council was authorized to give consent to the laying of railroad tracks within the streets and public places of such city, and it would, undoubtedly, have had the implied power to give such assent

under the provisions of the Railroad Law above cited, so that there can be no question of the power. There is no dispute that on the 29th day of June, 1852, the common council adopted a resolution assenting to the construction of the Buffalo & New York City railroad across Chicago street and other streets in the city; but it seems to be thought that by reason of the wording of such resolution that the city of Buffalo reserved to itself the power to impose any kind of conditions upon the assent which it might thereafter determine to be to its advantage, and this is one of the matters which it is well to dispose of in the beginning. This resolution provided as follows:

"Resolved, that permission be and is hereby granted to the Buffalo & New York City Railroad Company to construct their road and lay down their track for the same across Chicago, * * * streets, in accordance with their plan proposed, subject to the future control and pleasure of the common council of the city of Buffalo with respect to said crossings, and provided the Buffalo & New York City Railroad Company shall discontinue their tracks from Michigan street for 100 feet easterly whenever the Buffalo & Rochester Railroad Company shall do the same with their tracks."

It is probably true that the common council might have demanded, as a condition of assenting to the construction of this railroad across its streets, that it make use of a bridge or viaduct, or that it provide for underground crossings, and a contract of this character would have been enforced; but to suggest that there was any reserved right in the common council to require the construction or maintenance of such a viaduct as the modern development of the city of Buffalo has made necessary in the clause, "subject to the future control and pleasure of the common council of the city of Buffalo with respect to said crossings," is entirely untenable.

[2] The statute provided that every—

"corporation formed under this act shall * * * have power to construct their road across * * * any * * * street * * * which the route of its road shall intersect; * * * but the company shall restore the * * * street * * * thus intersected * * * to its former state, or to such state as not unnecessarily to have impaired its usefulness. * * * Nothing in this act contained shall be construed to authorize * * * the construction of any railroad not already located * * * across any street in any city without the assent of the corporation of such city."

It thus appears that the defendant's predecessor in right did not derive its right to cross Chicago street with its tracks from the city of Buffalo, but from the state of New York; and that it took this right subject only to the condition of obtaining the assent of the city of Buffalo by the vote of its common council, and to the duty of restoring the street to its former state, or to a state of usefulness not unnecessarily impaired. The right, being conferred by the Legislature, is subject to no limitations except those prescribed by that act. It was not in the power of the common council, except as a condition of its giving its assent in the first instance—if it actually had this power— to require any other condition than that the street should be restored to its former state, or to such a state that its usefulness should not be unnecessarily impaired.

[3] Being conferred, so far as the city is concerned, only on condition of the assent of the common council, it became absolute when that

consent was given, and was not subject to revocation by any authority short of that by which it was conferred. The Legislature confers the right subject to the assent of the city; that assent being obtained, the right becomes an absolute one, conferred by the Legislature, and not by the city, and cannot be revoked by any act of the latter. Delaware, Lackawanna & Western R. R. Co. v. City of Buffalo, 65 Hun, 464, 468, 469, 20 N. Y. Supp. 448. Such a right constitutes a special franchise, which is created by grant, and cannot be acquired by purchase or condemnation. People ex rel. N. Y. C. & H. R. R. Co. v. Woodbury, 203 N. Y. 167, 176, 96 N. E. 431, and authority there cited. And this special franchise is a part of the property of the railroad company, protected by constitutional provisions. People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684.

Being an absolute right conferred by the Legislature, the common council might defeat the construction of the railroad over a particular street by refusing its assent to the crossing; but, once having permitted the crossing to be made, the act of the Legislature prescribed what conditions should attach, and the common council had no more control over the crossing than it had over the legislation which authorized it. The language of the provision which prescribes the manner in which the right is to be exercised necessarily implies that the public use of the highway crossed may be to some extent obstructed, and its usefulness to some extent impaired. The requirement is that the street shall be restored to its former state, "or to such state as not unnecessarily to have impaired its usefulness."

[4] It is not, therefore, every obstruction to the easement of the local public in the street, by the construction of a railroad across it, which becomes ipso facto a public nuisance, but only such an obstruction as is unnecessary to the exercise of the more important easement of the general public in the railroad to be constructed. Delaware, Lackawanna & Western R. R. Co. v. City of Buffalo, 65 Hun, 469, 20 N. Y. Supp. 448, and authorities there cited.

If we are right in this proposition, then the respondent's predecessor was lawfully occupying a portion of Chicago street long before any of the legislation now under consideration was enacted. It had, as against the city of Buffalo, a perfect right to maintain its tracks in and across that street, and without legislative action the city of Buffalo had no more control over the railroad at this point, outside of its police regulations, than it had over its private right of way. The franchise of the state had become effective, while the railroad corporation owed the continuing duty of maintaining the crossing in such a state as not to unnecessarily interfere with the highway, it was not in the power of the city of Buffalo to impose a higher obligation than that prescribed by statute. The railroad corporation, by complying with the conditions prescribed by the statute, had become vested with the franchise, subject to the obligation to maintain the crossing in its former state, or in such a state as not unnecessarily to interfere with the use of the same for a public highway; but in the absence of legislation there was no power in the city of Buffalo, or in any other body, to impose an obligation to put the highway in a better condition than that required by the law under which the franchise was created.

[5] We must, therefore, in determining the questions here presented for adjudication, look to the subsequent acts of the Legislature to determine the rights of both parties. They cannot in any degree depend upon the form of the resolution giving assent to the occupation of the street by the railroad corporation. In other words, the price of the franchise, prescribed by the statute, was that the railroad company should replace the street in such a manner as not to unnecessarily impair its usefulness. This had no reference to the amount of use made of such crossing in the operation of trains; that was involved in the general franchises of the railroad, which embraced the—

"rights or privileges which are essential to the operations of the corporation, and without which its road and works would be of little value; such as the franchise to run cars, to take tolls, to appropriate earth and gravel for the bed of its road, or water for its engines, and the like." Morgan v. Louisiana, 93 U. S. 217, 223 (23 L. Ed. 860).

When the operation of the railroad over this highway crossing reached a development where the safety and welfare of the public demanded the construction of a viaduct over the railroad, there can be no doubt that the Legislature had the power to impose that burden upon the railroad corporation as a further condition of its franchises. It, however, had the equal power to impose the burden of maintaining Chicago street in a safe condition for public travel upon the municipal corporation, and it could have compelled the city of Buffalo to construct this viaduct at its own expense, if, in its judgment, this was an equitable adjustment of the rights of the two corporations as they had been developed in the growth of the city. Both corporations derive their existence and their powers from the Legislature; both are created for public purposes.

[6] A railroad is a public highway (Olcott v. Supervisors, 16 Wall. 678, 21 L. Ed. 382), and is justified by as high a public policy as that which creates municipal corporations; and if the operation of a railroad, carrying interstate commerce, and fostering the development of the resources of the state, has helped to create a great municipality, and the two have brought about a condition where the safety of the traveling public upon both highways requires the expenditure of money to bring about a normal condition, no good reason suggests itself to our mind why the Legislature may not take a broad view of the question and adjust the burden equitably between the two.

This is what the Legislature has done in the present instance. It has, by the enactment of chapter 345 of the Laws of 1888, and its subsequent amendments, provided—

"for the relief of the city of Buffalo and to change and regulate the crossing and occupation of the streets, avenues and public grounds in said city by railroads."

Section 1 of this act, as amended by chapter 353 of the Laws of 1892, provides for the appointment of commissioners—

"any six of whom are authorized to enter into contracts from time to time on behalf of the city of Buffalo with any railroad company or companies or any terminal company organized for that purpose, for the relief of the city from the obstruction of the streets of the city of Buffalo by railroads crossing

the same at grade upon plans adopted or to be adopted by said commissioners as hereinafter provided. All agreements so made shall be binding upon the city."

Section 6 of the same act, as amended by chapter 353 of the Laws of 1892, provides that the commissioners shall adopt a general plan—

"for the relief of the city from the present and prospective obstructions of the streets of the city by railroads crossing the same at grade and may from time to time alter, amend, or modify the same as to any detail, but said general plan when adopted shall not extend beyond the general plan heretofore adopted by said commission under which contracts have already been entered into, nor shall the same be extended; they may make contracts on behalf of the city with any railroad company or companies to carry out the purpose of this act, and may, by agreement with the contracting company alter, modify, or change any contract heretofore or hereafter made by them; they shall, before entering into any contract, cause the detailed plans of the work to be done by the contracting parties under the general plan to be prepared by the chief engineer  *  *  *  and the engineer representing the company or companies with whom said contract is to be made may join with him in preparing such plans; and said detailed plans shall enter into and form a part of said contract.  *  *  *  They shall, where the crossing of the railroad is to be overhead, designate the height of the crossing above the grade of the street, and the plan and materials of the structure to be used for the crossing, conforming the same to the general plan; if the crossing by the railroad is to be underneath, they may designate the *height, plan and materials of the structure to be used as a highway over the railroad tracks*, conforming the same to the general plan. They may, from time to time, alter or modify any plan adopted by them, except as heretofore provided as to the general plan. In adopting or modifying any plan they shall not materially change the elevation of any tracks now crossing any street, avenue or public place overhead, or the tracks of another railroad overhead. They shall enforce the execution of the plans adopted by them, by the railroad companies affected by them and by the city," etc.

[7, 8] It is essential to any contract that there shall be a meeting and agreement of minds; without such an agreement there can be no contract in contemplation of law. When, therefore, the Legislature creates a body and authorizes it to contract with reference to a particular proposition, it must be deemed to have endowed it with the powers necessary to the reaching of such an agreement, and at the same time to have invested its corporation with the power to come to a like agreement in respect to the matter dealt with. Contracting with reference to a complicated situation, such as must necessarily exist in a radical changing of the grades of public highways involved in the elimination of grade crossings in the city of Buffalo, must contemplate large discretionary powers. The commissioners were to adopt the general plan without any reference to the wishes or convenience of the railroad companies; it was distinctively "an act to provide for the relief of the city of Buffalo," and it was only after the general plan was adopted that the engineer of any railroad company might be permitted to join in the making of the detailed plans of the work to be done. Obviously under such circumstances there must be some room for adjustment; some power in the commissioners to make concessions to the railroad companies which were expected to come in and contract in reference to the carrying out of this general plan. Otherwise, there would be no element of contracting, in so far as the railroad companies were concerned, for there can be no contract in the fair accep-

tation of that word without an opportunity freely to agree to the terms.

The statute gave the commissioners the power to act in behalf of the city of Buffalo, to prepare the general plan, and to work out the details with the railroad companies' engineers, and it authorized them to contract in reference to those plans; but it did not compel the railroad companies to accept and carry out such plans without any reference to the burden cast upon them, whether of construction or maintenance. These were left open for negotiation between the commissioners and the railroad companies, each acting freely under its expressed or implied authority to contract. But there were some limitations upon the commissioners in respect to the plans which were involved in the contracts to be made; they could not entirely disregard the rights of the railroads, and it is most significant, as bearing upon the rights of the city of Buffalo in the present proceeding, that the the theory of the statute clearly contemplates a separation of the two easements at a street crossing. While there is no doubt that a street within the city is dedicated to the public for all of the purposes of a highway, and that one public use cannot be imposed upon another without statutory authority, there can be no question of the right of the Legislature, as between two public corporations, to limit and define the extent of the rights of both in so far as they are disassociated from the rights of individuals. Thus, while the individual, in dedicating land to the uses of a highway, surrenders only his rights which are necessary to the purposes of a highway, which in a city would include the right to lay sewers and gas and water pipes, the Legislature in authorizing a railroad to construct its tracks across such highway determines the extent to which the land shall be used for highway purposes as well as for railroad purposes and it has a perfect right as between the municipal and the railroad corporation to say that one shall possess the rights above the ground at a certain height, while the other shall be limited to the surface, or to a point below the surface of the ground. In other words, in contemplation of the law, it may dismember the easement; it may relinquish the right to lay sewers, etc., in the ground, and determine that the easement shall be limited to the mere use of teams and pedestrians, to the end that the railroad corporation, equally vital to the well-being of the people, shall have the fuller and freer exercise of its franchises, not alone to construct within the limits of the highway, but to operate its lines with greater speed and facility.

So we find the Legislature in the statute here under consideration providing that the commissioners "shall, where the crossing of the railroad is to be overhead, designate the height of the crossing above the grade of the street," and, singularly enough, no one has yet suggested that the railroad was under any obligations to maintain the paving of such street under such structure, for the obvious reason that in that case there is a relief to the highway—it is left free from the obstruction of the railroad crossing. But the statute continues:

"If the crossing by the railroad is to be underneath, they may designate the height, plan and materials of the *structure to be used as a highway over the railroad tracks,* conforming the same to the general plan."

And now it is urged, though the same relief is afforded to the highway, that it is the duty of the railroad corporation to pay the cost of maintaining this "structure to be used as a highway over the railroad tracks," notwithstanding the contract by which it was specially provided that the municipality should maintain such structure.

It is to be remembered that the grade crossing commissioners had jurisdiction of a large number of crossings. The statute contemplated that the general plan would involve the construction of overhead crossings to carry the railroad tracks in some instances, while in others the structure would be "used as a highway over the railroad tracks," and in the natural course of events the railroad corporation would be called upon to maintain the structure necessary to the operation of its road, while the municipality, under its general obligation to maintain the highways, would be called upon to stand the expense of those structures which were "used as a highway over the railroad tracks." The structure to carry the tracks over the highway would be appurtenant to the easement of the railroad, would constitute a part of its property (People v. Purdy, 149 N. Y. Supp. 315, 317), and it would be obviously improper to impose upon the municipality the duty of maintaining such structure, not only because it would not be a "city purpose," within the constitutional meaning of that language, but because it would permit the railroad corporation to be relieved of its obligation to the state to maintain its roadway in the highest possible efficiency for the safety of its passengers and the proper transportation of freight. On the other hand, where the structure was to be "used as a highway over the railroad tracks," where such structure became an "essential part of the street system" (People v. Purdy, supra), and where, if such structures were entirely removed, the operation of the railroad would be in no wise impaired (People v. Purdy, supra), it would seem, in the absence of any contract whatever in respect to the maintenance, it would devolve upon the city of Buffalo to care for such structures.

It is not questioned that this is the proper rule in the case of subways; it seems to be assumed that the municipality owes the duty of maintaining the streets in subways, but this proceeding attempts to cut up the grade crossing enterprise, and to ask this court, in respect to a single viaduct, to hold that the contract, imposing the cost of maintaining the same, is void as being without consideration and against public policy. The contract in question did not deal with the Chicago street viaduct singly; it dealt with the whole problem of grade crossings as it was presented in 1892, in the city of Buffalo, and it provided for the sharing of the expenses incident to the physical changing of the grades at all of the streets involved in the general plan, and then it was agreed:

"That on and after the completion of the work set forth in this contract and upon the detail plans, the city of Buffalo is to be at the sole expense of the repair and maintenance of all subways to carry streets and avenues under railroads and all viaducts and bridges to carry streets and avenues over railroads, and of the ramps and approaches to such subways, bridges and viaducts."

[9] But it is said this contract is without consideration. Obviously the railroad was compelled by the provisions of law relating to grade

crossings in the city of Buffalo to expend large sums of money in elevating its tracks at certain points, and these elevated structures it was bound to maintain. While it was permitted to contract in respect to the performance of the work, it was compelled to submit to the elimination of these grade crossings, and to pay its proper share of the cost (section 5, as amended by chapter 1039 of the Laws of 1895), and a consideration consists either in some right, interest, profit, or benefit accruing to the party who makes the promise, or some forbearance, detriment, loss, responsibility, act, labor, or service given, suffered, or undertaken by the other to whom it is made (6 Am. & Eng. Ency. of Law, 678). It is true, of course, that the Legislature might have imposed this burden of construction wholly upon the railroad corporation; but the Legislature is not bound to be unjust simply because it has the power, and it having elected to permit of a contract between those two corporations, by which a heavy burden was imposed upon the railroad corporation, we are of the opinion that the suggestion that the contract was without consideration is not tenable.

[10] However this may be, upon the question of maintaining the structures "to be used as a highway" we are clearly of the opinion that the contract added no burden which was not already imposed by law upon the municipality; it had been charged with the duty of opening and maintaining highways, and nothing in the grade crossing acts, or in the charter of the city, to which our attention has been called, has ever relieved it of these duties. It is true, under its original franchise the railroad was bound, as an incident of keeping its own right of way across the highway, to maintain the crossing so as not to unnecessarily interfere with its usefulness; but this did not take away the general obligation of the municipality to maintain the highway, and when the Legislature imposed the duty upon the railroad to share in the expense of changing the grade of streets and railroads, it evidenced no intention of turning the control of the substituted highways to the railroad corporations. It left them to the natural operation of law as applied to changed circumstances, the municipality having control of the structures used as highways, while the railroad retained the continued control of its own structures, each bound to discharge its duty by the public and to pay the expense thereof from its own funds. The contract here under consideration merely expressed the law as applicable to the circumstances after each party to the contract had performed its part of the obligation of making the change in grade, and there is no more reason in law or equity why we should charge the railroad with the burden of maintaining the viaduct over the railroad at Chicago street than there is for imposing the burden of paving through the subway where the railroad is carried overhead.

[11] We know of no public policy of this state not expressed in the statutes, in so far as the questions involved in this proceeding are concerned, and as we construe those statutes, they provide for just what has been done in the city of Buffalo. "The public policy of the state," says the court in Matter of Lampson, 161 N. Y. 511, 519, 56 N. E. 9, 11, "is evidenced in the public acts of its legislative body and is defined and applied in the decisions of its courts. * * * It is better

to adhere to the plain language of the law than to resort to the unsafe ground of inference, or of public policy." And clearly that is the attitude to be taken in reference to the present application. The Legislature has authorized the making of the contract here under consideration.

[12] We have seen that the contract, in so far as it is here under criticism, is in harmony with the law, that it is merely an expression of what the law would be held to be if it were not mentioned in the contract, and the Legislature, revising and amending the original act, and presumably with a full knowledge of all that had been done under its provisions, ratified and confirmed the acts and contracts of the commissioners in the year 1911. Section 15 of chapter 358 of the Laws of 1911 provides:

"All of the official acts of the grade crossing commissioners of the city of Buffalo, or a majority of them, in making and executing any contracts with any railroad company for the purpose of carrying out any plan or plans of said commissioners and all contracts entered into by said commissioners with any railroad are hereby affirmed and ratified, and shall be held to be in full force and validity, and all the acts of said commissioners or a majority of them in making and executing any such contracts shall be adjudged to have been legally made and executed in any and all proceedings or contracts relating thereto or founded thereon, but nothing in this section shall affect any action or proceeding pending in any court when this act takes effect."

Clearly, if the Legislature had the power in the first instance to grant the power of making such contracts as the one now before us, it has the power to ratify and confirm the contracts as made, and the act above quoted could have no other purpose than to accomplish this result. It is suggested, however, that there has been an effort to contract away the police power of the state, and that this is beyond the scope of legislative power. It may be conceded that it is not for one Legislature to authorize contracts which preclude a succeeding Legislature from exercising its functions, but we look in vain to the legislation in reference to grade crossings within the city of Buffalo for any such action.

There is no attempt to limit the power of the Legislature in the exercise of its police powers. It is at perfect liberty, notwithstanding anything contained in the contracts before us, to enact any legislation which may be necessary and proper in respect to the safety, welfare, and morality of the people of this state. A contract which calls upon the city of Buffalo to pay the expense of maintaining a part of its street system does not affect the police power in the slightest degree; that obligation rested upon the municipality before the contract was executed, and it has never been relieved of the obligation. What duties the Legislature may, at some future time, determine to impose upon the railroad corporation as a condition of its continued exercise of corporate franchises, are not forestalled, though it may be doubted if it will ever consent to charge a railroad corporation with the duties and obligations which properly belong to a municipal corporation in respect to its highways. When a case is presented in which the Legislature is limited in its legislative powers by the operation of a contract made under its authority, it will be time for a serious discussion of the lim-

itutions upon the police powers of the state; at present the question is purely academic, and need not be further discussed.

We are of the opinion that none of the provisions of the general grade crossing law have any relation to the question now under consideration, that all of the rights of the municipality and of the railroad were adjusted in the contract which was lawfully made and delivered, and there is no intention on the part of the more recent legislation to change the special provisions relating to the grade crossings eliminated under the local act.

The application for a peremptory writ of mandamus must be denied, with $50 costs.