Argued October **7,** reversed November 18, 1924, rehearing denied January 20, 1925.

## ALEXANDER PEARSON *v.* TWOHY BROS. ET AL.

(231 Pac. 129.)

**Railroads—City Exercising Police Power may Provide for Elimination of Grade Crossings.**

· 1. City, vested by practically autonomous charter with police power, has authority to declare railroad grade crossings dangerous and provide for their elimination.

**Railroads — Municipality Prescribing Construction of Viaducts is Exercising Legislative Function not Subject to Review by Courts.**

2. City, constituting practical governmental autonomy, possessing legislative functions in prescribing manner of construction of viaducts over railroad street crossings, may relieve railroad partially or entirely of burden, and in so doing is exercising legislative function, not subject to judicial review.

**Municipal Corporations—Municipality cannot Bargain Away Police Power.**

3. A municipality cannot bargain away **or** abjure its police power.

---

1. See 22 R. C. L. 796.
3. See 19 R. C. L. 798.

Municipal Corporations—Courts may Review Reasonableness of Exercise of Police Power.

4. Courts may review and reasonably restrict municipal exercise of police power.

Municipal Corporations—City may Direct Disposition of Dirt Excavated in Eliminating Railroad Grade Crossing.

5. City, in requiring lowering of railroad grades and construction of overhead viaducts to eliminate grade crossings, has power to direct that earth in part of street embraced in railroad's right of way, when excavated, shall be placed in approaches to viaduct, and railroad, in appropriating and removing such dirt, is liable.

Railroads—City, in Requiring Elimination of Grade Crossings, may Reasonably Interfere With Operation of Trains.

6. City, in prescribing manner of elimination of dangerous grade crossings, may, either by itself or by its contractor, reasonably interfere with operation of trains to protect public interest.

Municipal Corporations—Police Power Includes Means to Enforce Ordinances.

7. Police power possessed by City of Portland, under Special Laws of 1903, pages 3, 27, empowers city to use proper means to enforce its ordinances, subject to judicial review as to reasonableness.

Municipal Corporations—Nonsuit, in Municipal Contractor's Action Against Railroad for Appropriation of Dirt Excavated from Crossing, Held Improperly Granted.

8. Municipal contractor, required by ordinance under which he was operating to place dirt excavated from street in lowering railroad grade crossing on approaches of that street to overhead viaduct, *held* to have made *prima facie* case against railroad, when he showed that it had appropriated, for other uses, dirt so excavated, such that granting of involuntary nonsuit was error.

Appeal and Error—Refusal to Permit Defendants to Amend Pleading Held not Reviewable, on Appeal by Plaintiff Only.

9. On plaintiff's appeal from judgment of involuntary nonsuit, question whether defendants had been improperly denied permission to amend their answers *held* not properly before court, in absence of appeal by them.

---

See (1) 33 Cyc. 290.   (2) 33 Cyc. 292, 300 (1926 Anno.).   (3) 13 C. J. 912.   (4) 28 Cyc. 774.   (5, 8) 28 Cyc. 847.   (6) 33 Cyc. 293 (1926 Anno.).   (7) 28 Cyc. 759.   (9) 4 C. J. 694.

From Multnomah: ROBERT G. MORROW, Judge.

---

6. See 19 R. C. L. 855.
7. See 19 R. C. L. 805.
9. See 2 R. C. L. 182.

In Banc.

REVERSED. REHEARING DENIED.

For appellant there was a brief over the name of *Messrs. Olson & Bain,* with an oral argument by *Mr. James R. Bain.*

For respondent, Twohy Bros., there was a brief over the name of *Messrs. Wilson & Guthrie,* and over the names of *Mr. A. C. Spencer* and *Mr. John F. Reilly,* for respondent, O.-W. R. & N. Co., with an oral argument by *Mr. Reilly.*

BURNETT, J.—For many years the defendant, Oregon-Washington Railroad & Navigation Company, has owned and operated a railroad running easterly out of the City of Portland in Sullivan's Gulch. When the scheme of improvement here involved was inaugurated, several streets crossed the railroad tracks at grade. The City of Portland is a municipal corporation, the legal voters residing in which have authority to make or amend its charter, where formerly such instrument was enacted by the legislative assembly of the state. In other words, within the scope of municipal government it is practically an autonomy.

At all times involved in this litigation, the council of the city had power and authority, subject to the limitations and restrictions of the charter:

"To exercise within the limits of the City of Portland all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said limits." Portland Charter, § 73, subd. 1.

Operating under this power, the council by ordinance declared nine grade crossings of the railroad in

the eastern part of the city to be dangerous and directed the City Engineer to prepare plans, specifications and estimates of costs for their elimination. The general feature of the project was to lower the existing grade of the railroad company at the crossings an average of eleven feet and to raise the street level at those points correspondingly so that the trains of the company could go under viaducts to be erected there. In these intersections were various sewers, water-mains and gas-mains. The water-mains were owned by the city as part of its Bull Run water system, and the sewers were also city property. After the plans and specifications were prepared by the engineer and submitted to the council, they were amended in various particulars and an ordinance was regularly enacted adopting them as thus altered. The city retained the power of building the viaducts, lowering the water-mains and sewers, and required the owners of the gas-mains to lower them to a certain subgrade.

The following provisions appear in the specifications adopted by the ordinance.

Article I, Section 3.

"Regrading the right of way, or such portions of the right of way as may be desired by said railroad company, outside the lines of streets where viaducts are proposed to be built under these specifications and the accompanying plans, shall be performed by the OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY and shall be directly paid for by said Company.

"It is specifically provided that the excavation of said company for regrading their right of way shall conform to the plans and profile attached hereto, in that the finished grade of the railroad tracks shall be so laid that foundations of sewers, new viaducts, water mains, gas mains or any other public utilities shall in no manner be endangered nor interfered

with, and shall be to the satisfaction and approval of the Engineer."

Article I, Section 4.

"(a) Contract.

"A contract will be let by the Council for the construction of all subways, temporary viaducts, permanent viaducts and their approaches complete, ready for the traffic for which they are designed; and for the removal and relaying of all water services and mains and for the relaying and extension of sewers, sewer services and inlets affected by the regrading operations; all water main operations subject to supervision by the Bureau of Water Works of the Department of Public Utilities of Portland.

"(b) East Sixtieth Street Mains.

"It is especially conditioned that the thirty (30) inch water main laid in E. Sixtieth Street shall be removed and relaid in subways to be constructed for that purpose Prior to the commencement of physically regrading the roadbed of the said railroad company. When the thirty (30) inch water main shall have been reinstalled in service, the operation of removing and relaying all other water mains may proceed simultaneously with regrading operations."

Article XXXVIII contains provisions for readjustment of all water-mains which cross the tracks of the railroad company, and for relaying them under the tracks or removing them from such a situation, as the case may be, involving work upon and under the railway tracks.

Article I, Section 1.

"A contract will be let by the City of Portland, Oregon, covering the furnishing of all materials and the construction of all viaducts, both temporary and permanent, together with all approaches thereto, the excavation of the railroad prism under all permanent viaducts, the construction and reconstruction of all sewers and their appurtenances affected by the operations, and the removal and replacement of all water

mains affected by the operations, upon which a time limit is set and a per diem bonus is offered for the completion of the work prior to expiration of the said time limit and a per diem sum as liquidated damages contracted for, upon each day necessary to complete the entire contract after the expiration of the time limit set."

Article XXIII, Section 3.

"Excavations for the installation of the subways shall be made to line and grade, which shall be of sufficient size in which to build forms and brace the trench, and shall be made in conformity with Section 1 of this Article. Price bid for this excavation shall include the blocking of alignment and gradienting of water mains and removal of blocking when subways shall have been completed."

Article XXIII, Section 5.

"At the location of each of the permanent viaducts and within the lines given by the Engineer, the prism for the full number of railroad tracks for which the viaduct is designed, shall be excavated to the subgrade of the railway tracks, and shall be deposited in successive layers or courses in the approaches as is provided in Section 1 of Article XXIV of these specifications, for which a price shall be paid as foundation excavation, measured in excavation only."

The city let a contract to the plaintiff for the performance of such work in the enterprise as the city reserved to itself. About the same time the railroad company let a contract to the defendant Twohy Brothers Company for excavating the part required to be excavated by the railroad company. The plaintiff claims that the defendant railway company and Twohy Brothers interfered with his work, hindered and delayed him, doing great damage to him, particularly that they excavated the prisms that he was required to excavate, and instead of placing the earth

therefrom upon the approaches in the particular
street from which the excavation was made, they
carried it away and disposed of it in a fill in Mock's
Bottom, some miles from the improvement. The
answers of the defendants avowed the taking of the
earth from the prisms and claimed that the soil thus
excavated was exclusive property of the railway
company, and made other defenses to the remaining
grievances of the plaintiff.

After a long trial, piling up an excessively pon-
derous record, the Circuit Court, on motion of the
defendants, entered a judgment of involuntary non-
suit against the plaintiff, and he appealed.

1. The principal bone of contention in the case
relates to the prisms. All other contentions are
closely related to that matter. The prisms, so called,
consist of the earth within a parallelogram formed
by the parallel lines of the railroad company's right
of way and the boundaries of the several streets where
the right of way and streets cross each other. Vested
as it is in its autonomous charter, with the police
power, it is clearly within the authority of the city
to declare those grade crossings to be dangerous and
to provide for their elimination. According to *Cleve-
land* v. *City Council*, 102 Ga. 233 (29 S. E. 584, 43
L. R. A. 638), laying out a highway across a railroad
right of way without award of damages to the com-
pany,

"proceeds upon the theory that land already taken
for public use may be taken by proper authority for
other public uses, and when so taken, it is presumed
the second use is not inconsistent with or destructive
of the former use. * *

"It is the railroad which makes the construction of
a railroad crossing necessary, whether the highway
be laid out before or after the construction of the
railroad."

The case goes on and sets forth the doctrine that a railroad is constructed subject to the right of public authorities to require such changes in grade, overhead crossings and the like as the public safety and convenience may require from time to time. This case depended upon a Georgia statute and the question was whether the change of grade in the railroad to correspond with the raising of the street grade should be made at the expense of the company or of the city, and the court concluded with these words:

"We know of no law whereby a corporation or natural person can recover damages on account of being compelled to render obedience to a public regulation designed to secure the common welfare."

*Chicago, Milwaukee & St. Paul Railway Co.* v. *Minneapolis,* 232 U. S. 430 (58 L. Ed. 671, 34 Sup. Ct. Rep. 400, see, also, Rose's U. S. Notes), contains this syllabus:

"Railroad corporations may be required, at their own expense, not only to abolish grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways."

Further, in *New Orleans Gas Light Co.* v. *Drainage Com.,* 197 U. S. 453 (49 L. Ed. 831, 25 Sup. Ct. Rep. 471, see, also, Rose's U. S. Notes), the principle is thus laid down in the syllabus:

"Every reason of public policy requires that grants in the sub-surface of streets shall be held subject to such reasonable regulation as the public health and safety may require.

"Uncompensated obedience to a regulation enacted for the public safety under the police power of the state is not a taking of property without due compensation."

*Anderson* v. *Fuller,* 51 Fla. 380 (41 South. 684, 120 Am. St. Rep. 170, 6 L. R. A. (N. S.) 1026), contains the following language:

"And while municipalities may by ordinance grant to individuals and corporations the privilege of occupying the streets and public ways for lawful purposes, such as railroad tracks, poles, wires, and gas and water pipes, such rights are at all times held in subordination to the superior rights of the public, and all necessary and desirable police ordinances, that are reasonable, may be enacted and enforced to protect the public health, safety, and convenience, notwithstanding the same may interfere with legal franchise rights."

It is true that that case was one where an attack was made upon a scheme of public improvement on the ground that the legislative charter of the city required bids to be let to the lowest responsible bidder, and under such a charter, the requiring of a contractor to replace public utilities, such as water-mains, sewers, railroad tracks and the like, was placing a burden on the taxpayers which should be borne by the owners of those utilities. But here that question is not involved, because the City of Portland, for all purposes involved in this case, is autonomous, and can legislate as it chooses, to lay part of the burden of the change upon the city and part upon the railroad company. Under such circumstances, such a question is legislative and cannot be reviewed by the judicial department of the state.

*State ex rel.* v. *Minnesota Transfer Ry. Co.,* 80 Minn. 108 (83 N. W. 32, 50. L. R. A. 656), is another case cited by the defendants. The city acting under a legislative charter had formerly agreed with the railway company to construct an overhead bridge over the tracks for a distance of 1300 feet. The conditions were, among others, that the city should per-

petually thereafter keep it in repair; refuse permis-
sion to any other lines to cross the tracks at grade,
and compel them, if they crossed at all, to do so on a
bridge built so as to conform in all things to the one
erected under the contract. The city repaired the
bridge from time to time through several years, but
afterwards brought *mandamus* to compel the com-
pany to repair according to certain plans and specifi-
cations prescribed by the city council. The company
relied on the contract. The court held it to be the
primary duty of the company to keep the crossing
in reasonably safe condition for travel across the
tracks; that the contract was void because it was an
attempt by the city to adjure the police power for all
time and that the city lawfully could repudiate the
agreement at any time. But the court, in treating
of the duty of the company to maintain the street so
that it would be safe as a means of crossing the tracks,
also said:

"It must be maintained while the duty continues,
that the public may be suitably provided for. The
person or corporation creating the necessity can only
be released from the duty by some act of the legis-
lature."

The conclusion was that the company was required
by peremptory *mandamus* to repair the viaduct ac-
cording to plans and specifications prescribed by the
city.

From this precedent it may be deduced that the city
had authority to prescribe how the repairs should be
made and who should make them. Also that the legis-
lative power could relieve the company partially or
wholly from its primary duty to maintain the cross-
ing.

2. In this instance the City of Portland, for all the
purposes of this case, is a governmental autonomy

possessing legislative functions and the right to exercise the police power and so to promote the public peace, health and safety within its territorial limits. In its law-making capacity, it had authority to prescribe to the minutest detail, the manner of constructing the viaduct over the railway track and to relieve the railroad company partly or entirely of the primary burden of making the required betterment. In this, there was a legitimate field of legislation to be enacted by the city.

3, 4. The municipality cannot bargain away or abjure its police power. The essential object of such institution is to provide for the public peace, health and safety, and to permit it to lay aside that function would be to defeat the very end of its creation. On the other hand, the judicial department of the government has authority to review the action of a municipality exercising the police power and to restrict it to what is reasonable. It is not an arbitrary, uncontrolled power, but may be reviewed by the courts and restrained to reasonable limitations. Many instances are given in the precedents cited in the argument. For instance, in *Lawton* v. *Steele,* 152 U. S. 133 (38 L. Ed. 385, 14 Sup. Ct. Rep. 499), the summary destruction of fish-nets used in unlawful fishing was upheld. *Holden* v. *Hardy,* 169 U. S. 366 (42 L. Ed. 780, 18 Sup. Ct. Rep. 383, see, also, Rose's U. S. Notes), approves statutes restricting hours of labor to eight per day in mines and smelters except in cases of emergency where life or property is in imminent danger.

On the other hand, in *Seattle* v. *Columbia & P. S. Ry. Co.,* 6 Wash. 379 (33 Pac. 1048), after having granted a right of way at a fixed grade over and along certain streets, the city, after the fire of June 6, 1889, had destroyed the track, sought to raise the

grade of the streets two feet. Under the circumstances it amounted to a destruction of the railroad franchise, and rendered it impossible to operate a railroad there. The city was forbidden to raise the grade, because in the judgment of the court it amounted to an arbitrary and unreasonable exercise of the police power.

In *Denver & Rio Grande Ry. Co.* v. *Denver*, 250 U. S. 241 (63 L. Ed. 958, 39 Sup. Ct. Rep. 450), the railroad company was required to remove a track where it crossed a much frequented street leading to a union depot. It appeared that the track was used almost entirely for switching which could be otherwise accomplished at reasonable expense. Held to be a fair and reasonable exercise of the police power in the interest of the public safety, and not in derogation of interstate commerce, due process of law or integrity of contracts.

In *Illinois Central Ry. Co.* v. *Illinois*, 163 U. S. 142 (41 L. Ed. 107, 16 Sup. Ct. Rep. 1096, see, also, Rose's U. S. Notes), an Illinois statute required all trains to be stopped at the railroad station in every county seat to receive and discharge passengers. The company had established a station in Cairo, the original terminus, at the end of a curve to the west. Afterwards, in connection with other roads, it built a bridge across the Ohio River to which it laid a track leaving the original track about three and one-half miles from the station. This new track was used by through trains carrying mails and interstate commerce through Illinois, Kentucky, Tennessee and Alabama, to Mobile. To stop such trains at the Cairo station involved running three and one-half miles off the main line and back again before proceeding on their course. The company had provided short trains to serve passengers and freight destined

113 Or.—16

to and from the Cairo station in connection with through trains at the junction with the main line. The United States Supreme Court ruled against *mandamus* to the company to run its through trains to the Cairo station and back, using this language: -

"The State may make reasonable regulations to secure the safety of passengers, even on interstate trains, while within its borders. But the State can do nothing which will directly burden or impede the interstate traffic of the company or impair the usefulness of its facilities for such traffic."

Thus far we are safe in saying that the City of Portland is within its legitimate power in providing for the reconstruction of the street crossings so as to eliminate grade crossings. It had the right to declare by its ordinance the manner and means to be used in making those improvements.

5. The principal question is as to the right of the city to direct what shall be done with the earth excavated in the prisms; that is to say, the earth in that part of the street also embraced in the railroad's right of way. The specification on that point is already quoted to the effect that the prisms should be excavated and the dirt thus taken out should be placed in the approaches from that street to the viaduct. The rule as to the disposition of earth excavated from the street was laid down by Mr. Justice McBRIDE in *Sharkey* v. *Portland,* 58 Or. 353 (114 Pac. 933), to the effect that the abutting owner on a street in Portland owns the soil to the center of the street even after it is excavated, *"unless needed for the improvement of the same street."* He further says that:

"The weight of authority seems to be that the city is entitled to use the earth excavated from one portion of a street to make fills required upon the same

street, or upon other streets embraced in the same general plan of improvement.''

We have re-examined the same question and in this case it is not necessary to go so far as the rule laid down in the Sharkey case, although it is clearly stated and abundantly supported. The authorities are practically unanimous that the earth excavated in a street may be used by the public authorities for the improvement of the same street. The diversion of precedents arises on the contention that such earth may be taken and put upon another street whether in the same general scope of improvement or on independent lines. A valuable note on this subject is found appended to *Hamby* v. *Dawson Springs,* 126 Ky. 451 (104 S. W. 259, 12 L. R. A. (N. S.) 1164). A similar question was decided in *Arstill* v. *Fletcher,* 95 Or. 308, 319 (187 Pac. 854). This was a dispute about the earth excavated from a public drainage ditch, and it is there said, that:

''In making an improvement of the kind in question the public authorities have the right to use the material found in the ditch for the completion of that particular work.''

The city having enacted an ordinance to the effect that the prism earth should be excavated and placed in the approaches to the viaduct on that particular street, it had the effect of law and bound the railroad company as well as all others concerned. It is true, as stated by counsel in argument, that a contract binds only the parties to it and not strangers and they argue that the only thing involved in this case was whether the plaintiff's contract with the city could be violated to his damage by the defendants who were not parties to that contract. We agree with the argument that the defendants did not violate that contract, but they did confessedly violate a city

law covering the case when they took the prism earth and carried it away from the place where the city directed it should be deposited.

The case is not unlike where A contracts to build a house for B on the land of the latter. He goes upon the land with his materials and tools, makes the proper excavations, and while there C enters, destroys the materials, fills up the excavations, and thus delays and hinders A in the progress of his work. It amounts to a trespass upon B's land, and it likewise amounts to an infringement of the rights of A.

6. It is likewise argued that the city had no right, either by itself or by its contractor, to interfere in any manner with the operation of a railroad train. The rule is thus laid down in *Viliski* v. *Minneapolis*, 40 Minn. 304, 309 (41 N. W. 1050, 1052, 3 L. R. A. 831):

"Whenever it becomes reasonably necessary for purposes connected with the use or improvement of a public street or for the enjoyment of the public easement therein to have earth or rock excavated and removed therefrom and where it is impracticable in view of the public purposes to be accomplished to commit to the owners of the soil the work of excavation and removal, the public authorities may do this unembarrassed by claims of private ownership and right of disposal."

7. All things being equal, it was quite as proper for the city to assume control of the situation either directly or by its contractor in making the improvement where its public interests in the shape of sewers and water-mains were involved, as for the railroad company to take charge because its trackage might be in some way affected. More than that, the city is a government and has the precedence in the exercise of authority within its jurisdiction. It

could, and no doubt would, as carefully guard the interest of the company as the latter would the interest of the city. There is no immunity that doth hedge a railroad company, preventing a governmental agency from the legitimate and reasonable exercise of its power to promote public safety. Indeed, it has not been many years since the general government in its policy for the public safety assumed direct control of all the property of all the railroads and the operation thereof. The grant of the police power to the city came originally from the state in the legislative charter and was retained in the one enacted by the people of Portland: Special Laws 1903, pp. 3, 27. This grant necessarily includes the right to carry it into effect and empowers the city to use proper means to enforce its ordinances, subject, of course, to judicial review as to reasonableness. No issue, however, is presented on that point in the instant case.

8. Operating as he was under the city ordinance directing, as well it might, the disposition of the earth to be excavated from the prisms, the plaintiff made a *prima facie* case when he showed that the railroad company and its contractor had taken that very earth and carried it away and disposed of it in a place entirely different from that designated by the ordinance. On that feature alone, he was entitled to go to the jury, and it was error to enter an involuntary nonsuit at the close of the case.

9. In argument the defendants complained because the trial court did not allow them to amend their answers so as to set up the defense that the action, being one for damages arising from injury to non-contract rights of the plaintiff, had not been commenced within two years after the chose in action accrued. However that may be, that question is

*coram non judice* because the defendants did not appeal.

The judgment of nonsuit is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.   REHEARING DENIED.

BEAN AND BROWN, JJ., not sitting.

Mr. Justice RAND concurs in the result.