CONNERSVILLE HYDRAULIC COMPANY, ET AL. *v.*
CITY OF CONNERSVILLE.

[No. 13,348. Filed September 3, 1930. Rehearing denied December 11, 1930. Transfer denied December 7, 1932.]

*George D. Forkner, Carl H. Mote, Samuel J. Mantel, William P. Evans, Frank L. Littleton, Forrest Chenowith, H. N. Quigley* and *S. W. Baxter,* for appellants.

*James A. Clifton, Albert P. Heeb* and *Allen Wiles,* for appellee.

MCMAHAN, J.—In providing for a system of internal improvements, the legislature in 1836 created the Board of Internal Improvements and authorized it to proceed, within a reasonable time, to construct a canal from the point where the west branch of the White Water River crosses the National Road in Wayne County, southward to the Ohio River at Lawrenceburg. R. S. 1833, p. 337. Section 23 of that act gave the board authority to cause surplus water and ground to be leased for hydraulic purposes. The work of constructing the canal was commenced, but in 1842, the state, being financially embarrassed, could not go forward with the work. By an act approved January 20, 1842, the legislature (Local Laws 1842, p. 27) provided that certain named persons constituted a body corporate under the name of the White Water Valley Canal Company, hereinafter referred to as the canal company, and that, after certain conditions precedent were complied with, the interest of the state in the canal should be transferred to the canal company, such transfer to be effective on proclamation of the governor and subject to the stipulations named in the act, and for the completion of the canal by that company. Section 12 of said act provides that: "It shall be the duty of said company to construct suitable and convenient bridges over said canal and its feeders at all places where they may cross any existing state or county road or streets of towns which, at the time of constructing the same, shall be open and used as such."

Section 24, inter alia, provides: "That said company shall be bound to keep said White Water canal in repair, and furnish the water for all power, sold by the state on said canal, from the Ohio River to the point of com-

pletion." While the act does not expressly authorize the canal company to make leases of water privileges, such authority is implied.

The canal was completed and was in the possession of and operated by the canal company for a number of years, and was constructed across what are now known as Seventh and Eighth streets in the City of Connersville.

In 1865, Acts 1865, p. 116, §12938 Burns 1926, the legislature authorized railroad companies to occupy and use for railroad purposes the property of canal companies with the consent of such companies. The canal companies were given authority to grant, lease, or convey to any railroad company the "real estate and personal property and appurtenances, rights of way and privileges, to be occupied and used for railroad purpose," and also provides that no grant, lease, or conveyance should be made that would suffer the hydraulic power of any canal company then in use to be impaired, and, for the protection of the hydraulic power, the railroad was required to maintain the embankments thereof so far as they were occupied by the railroad company.

On December 5, 1865, the canal company, acting under said act, consented that the White Water Valley Railroad Company might occupy, and use forever, for railroad purposes the real and personal property of the canal company, which canal, with all rights of way and privileges, bridges, aqueducts, buildings, appendages, and appurtenances, were by deed conveyed and warranted to the White Water Valley Railroad Company, to be used and occupied by the railroad company to the extent the canal company had authority to convey, with a provision that such conveyance should not authorize the railroad company to impair the hydraulic power of the grantor or its lessees *then in use*, and that such conveyance should not grant the right of way for

water to run in the canal for hydraulic purposes to supply *the then lessee of water power,* or impair the hydraulic power of the canal company *then in use.* As a part of the consideration for said conveyance, the railroad company convenanted and agreed that for the protection of the hydraulic power of the canal it would maintain the embankments thereof so far as it used and occupied the same, and that it would not impair the hydraulic power of the canal *then in use,* nor impair in any way the contracts *then* existing between the canal company and the lessee of water power.

On May 12, 1879, the title and rights of the White Water Valley Railroad Company, with the privileges and appurtenances thereto, were, by virtue of a decree of foreclosure, sold and conveyed to the White Water Railroad Company. On November 1, 1890, the White Water Railroad Company sold and by deed conveyed its entire railroad and property to the Cleveland, Cincinnati, Chicago & St. Louis Railway Company, one of the appellants herein. No mention is made in either of the last two deeds of the canal, water power, or bridges.

On December 9, 1865, the "White Water Canal Company, by E. S. Hamlin, receiver," signed and acknowledged an instrument which, after reciting that Hamlin had been appointed receiver for the canal company by the United States Circuit Court for the District of Indiana and that he had been authorized to "receive and lease all water power which may expire, or to make leases for all unoccupied water power," subject to the approval of the canal company and of the court, and after referring to the execution of the above mentioned deed from the canal company to the railroad, states that in consideration of certain expenditures made by various lessees of water power in repairing the canal and the desire to secure a continuance of the then hydraulic power of the canal, and that in consideration of said

expenditures and the agreement of the Connersville Hydraulic Company to keep the canal in good and substantial repair·so as to keep up the hydraulic power of the canal and to perform towards all lessees of water power all covenants and agreements of the canal company toward each lessee, subject to the approval of the said court and in subordination of the right of the White Water Valley Railroad Company, he bargained, sold and conveyed to the hydraulic company for the term of 99 years, subject to right of renewal, "all the unoccupied water power" of a part of the canal which included the part passing through the city of Connersville and the appurtenances thereof, and "also the rents that shall accrue on any lease heretofore granted" by the canal company and the right to make all needed repairs for the purpose of keeping up the hydraulic power on that part of the canal. In consideration of which grant the hydraulic company covenanted to keep that part of the canal in good and substantial repair and that it would in all respects comply with the provisions· of the several acts imposing the duties in respect to real property of the canal, and especially with the Act of November 16, 1865, heretofore referred to. The hydraulic company also agreed that it would not interfere with the right of way of the railroad company, and would at all times allow the latter company the free use of water in canal for supplying locomotive engines with water. This instrument is signed "White Water Valley Canal Company, by E. S. Hamlin, Receiver," and is acknowledged by Hamlin as receiver. It does not bear or show an approval by the canal company or by the court. There is nothing outside of the recitals in the instrument to show that Hamlin had been appointed receiver, or that he had any authority to execute that or any other instrument of similar import. No question has been raised as to power of the receiver to exe-

cute this instrument, and we will assume he had such authority and that his acts were approved by the court.

Since the execution of said contract the hydraulic company has held and now holds and operates the canal as provided in said lease. Soon after the conveyance by the canal company to the railroad company in 1865 the latter company constructed a line of railroad along the east side of the canal and on the east bank thereof. That railroad has been in use ever since by the several railroads heretofore mentioned and is now owned and operated by the appellant railroad company.

Subsequent to the construction of said canal, bridges were constructed and maintained across the same at the points where it crossed Seventh and Eighth streets. The city of Connersville made repairs to the Seventh Street bridge at a cost of $366.71, and to the Eighth Street bridge at a cost of $537.41, the appellants having refused to repair either of such bridges. This suit was brought to recover the money so expended. The complaint is in two paragraphs, one addressed to each bridge.

The separate demurrer of each defendant to the complaint was sustained. This ruling, however, was reversed. See *City of Connersville* v. *Connersville, etc., Co.* (1921), 77 Ind. App. 184, 128 N. E. 682. Later the hydraulic company filed an answer in four paragraphs, the first being a general denial. The second alleges that in September, 1898, the city of Connersville and the hydraulic company entered into a contract by the terms of which the plaintiff forever released, cancelled, and satisfied all future demands against the hydraulic company for the building and repair of the bridges in question. A copy of this contract, marked "Exhibit A," was filed with and by reference made a part of the answer. This contract recites that in Oc-

tober, 1888, the hydraulic company and the city entered into two contracts whereby the hydraulic company agreed to furnish the city water for a period of twenty years, the city reserving the right to end the contracts at the end of any five-year period, and that the contract of 1898 was to be deemed as supplemental to and a modification of the two contracts of 1888. This supplemental contract then states that in consideration of the agreement on the part of the city to waive the privilege of terminating either of the contracts of 1888 the hydraulic company released the city from the duty of constructing gauges to measure the water and waived all limits as to the quantity of water the city might take for certain purposes. The city agreed to pay the hydraulic company $1,800 per year for water. It then provides that "It is further mutually agreed that the acceptance and execution of all claims, demands and choses in action now existing and held by either of the parties hereto against the other, and each of the parties hereby mutually release, cancel and satisfy all such claims, demands and choses in action against the other, including all future demands for building and repair of bridges."

The third and fourth paragraphs each alleges the existence of a dispute and controversy between the city and the hydraulic company; that the same was settled and compromised, and makes the said agreement of 1898 an exhibit, and that the hydraulic company was thereby released from claims, past and future, for the building and repair of the bridges.

The railroad filed an answer in three paragraphs, the first being a general denial. The second is in substance the same as the second paragraph of the answer of the hydraulic company. In the third paragraph it admits that it is the successor in title as alleged in the complaint; that on December 5, 1865, the canal company

by a certain conveyance granted the White Water Valley Railroad Company the right to construct its railroad upon a part of the land of the canal company, including that part in the city of Connersville, said conveyance being subject to the rights of the canal company thereby reserved to flow water over the land of the company, which was the subject of said conveyance; the execution of the lease to the hydraulic company; that the hydraulic company and the appellant railroad company each holds and uses the rights granted under said conveyance and lease. That the defendant railroad and its predecessors in title occupied the bank on the east side of the canal and did not interfere with or obstruct the rights of the canal company, or with the right of the hydraulic company to use the balance of the lands occupied by the canal for the flowage of water; that when said indentures were executed by the canal company the original bridges in use by the canal company at Seventh and Eighth streets were of sufficient height to permit the passage of boats with a tow path at one side; that upon the execution of said instruments the use of the canal for navigation was abandoned; that in constructing the railroad on the tow path it was necessary to lower and shorten the old bridges and relocate them on a level with the streets; that in constructing the railroad the railroad companies did not in any way obstruct or impair the privilege of the canal company or of its lessee, the hydraulic company, to flow water over the land for hydraulic purposes; that the bridges do not touch or occupy any portion of the lands formerly owned or possessed by the canal company and now occupied by the hydraulic company; that the bridges are not incident to the uses of the railway and the canal could be filled up at those points and the bridges removed if the hydraulic purposes were abandoned; that while the railroad company, by the indenture from the canal company, pur-

chased the bridges and the materials of which they were constructed, such purchase was only for the purpose of shortening and lowering them; that after the railroad was constructed, and the bridges shortened and lowered, such bridges were abandoned to the use of the canal company and the public, and never thereafter maintained by the railroad. The defendant railroad company, by this paragraph of answer, further alleges and "admits that it was responsible and liable for the maintenance of that part of said canal lands occupied and used by it for railroad purposes under the statutory enactment of the State of Indiana upon said subject, but says that its interest in any of the lands formerly owned by the White Water Valley Canal Company which are not put in the actual use and occupation of said railway company is a servient title and easement and subject to the dominant title and easement of said hydraulic company, as evidenced by the aforesaid indenture of lease; that the uses of said lands so occupied and enjoyed by the defendant railway company for railway purposes under its indenture of conveyance does not require the use of bridges across the other part of said canal lands occupied and used by said Connersville Hydraulic Company as a dominant easement thereon and thereover." It is alleged that a copy of the deed from the canal company to the railway company is made a part of the answer. The exhibit, which is filed with the answer, is a copy of the contract between the hydraulic company and the city dated in September, 1898, and not of the deed from the canal company to the railway.

The railroad company also filed a cross-complaint in two paragraphs against the hydraulic company. The first paragraph alleges the execution of the conveyance by Hamlin, receiver for the water company, to the railroad on December 5, 1865, a copy of such conveyance

being made an exhibit thereto. After describing the character of the bridges it alleges that the only purpose in acquiring title to the old bridges was that in constructing the railroad such bridges and approaches might be removed, lowered and shortened so that the railroad could be constructed at the grade; that the original bridges were abandoned and other bridges constructed there by the city; that the hydraulic company, in said lease from the canal company, agreed that it would perform toward all lessees of the canal all covenants and agreements of the lease, and would comply with the provisions of the several acts of the legislature respecting the canal, imposing duties in respect to the real property of the canal and the feeders and feeder dams; that if, by covenant or by law, the duty of maintaining bridges over the canal was cast upon the railway company the hydraulic company, by its lease from the canal company, expressly assumed that obligation, and asks that if any judgment be rendered in favor of the plaintiff that the railroad company be decreed to be liable thereon only in a secondary capacity and that the hydraulic company be decreed to be first liable for the performance of the duties in relation to the bridges.

The hydraulic company filed a cross-complaint in two paragraphs against the railroad. The first paragraph alleges the facts relating to the conveyance from the canal company to the railroad, and the several conveyances by which the title vested in the appellant railroad, which conveyances it is alleged included and conveyed the bridges to appellant railroad. The lease to the hydraulic company is also set out, and it is alleged that the lease was in express terms made in subordination to the rights of the railroad and asking that if any judgment was rendered for the plaintiff against this cross-complaint that it be given a judgment against the railroad for a like amount. Demurrers were

filed to each paragraph of the several answers other than the general denials and sustained. A trial by jury resulted in a verdict and judgment in favor of the city against both defendants for $1,555.59; that the hydraulic company is primarily liable for the judgment and that the railroad is secondarily liable. From this judgment the defendants have appealed, each assigning separate errors.

The railroad contends the court erred in overruling its demurrer to each paragraph of the complaint, in sustaining the demurrer to its second and third paragraphs of answer, and in overruling its motion for a new trial. The hydraulic company contends the court erred in sustaining the demurrer to its second, third, and fourth paragraphs of answer, in overruling its demurrer to the cross-complaint of the railroad, in sustaining the railroad's demurrer to each paragraph of the cross-complaint of the hydraulic company, and in overruling its motion for a new trial.

The principal contentions of the hydraulic company are: (1) That neither the railway company nor the hydraulic company is under any obligation to maintain the bridges because the evidence fails to show that Seventh and Eighth streets were in existence when the canal was constructed; (2) that the city, by the contract of 1898, released it from all future demands for the building and repair of the bridges; and (3) that if there is any liability on the part of either appellant to maintain the bridges, such liability exists against the railroad company alone and not against the hydraulic company. The railroad insists: (1) That it was never charged with the maintenance of the bridges; (2) that the hydraulic company, under its grant from the canal company was charged with the maintenance of the bridges; (3) that the city, by contract, released the hydraulic company from any future liability for the cost

of maintaining the bridges; and (4) that if it were ever liable for such maintenance it was only secondarily liable, and that the city, having released the hydraulic company from liability, by the same token released the railroad from its secondary liability.

The original liability of each appellant to the city, under the facts alleged in the complaint, was declared and settled by this court on the former appeal. Their liability as between themselves, however, was not determined in that appeal. That question and the effect of the contract wherein the city assumed to release the hydraulic company from any future liability to maintain the bridges are now presented for determination. Appellee insists that this contract, in so far as it attempted to release the hydraulic company from future demands for the building and repairing of the bridges, is void, for the reason that a municipal corporation has no power, by contract, ordinance or otherwise to cede away, limit or control its legislative or governmental powers, or to disable itself from performing its public duties. Appellants, on the other hand, contend that the contract was entered into by the city in the exercise of its business powers and that it did not and does not affect or relate to its governmental powers.

It is settled law that any person who, although acting under lawful authority, interferes with and cuts through an existing public highway and thus renders a bridge necessary must build such a bridge in order to enable the public to exercise their right of passage, and must maintain and repair such bridge, with its approaches, until he abandons his operations and restores the highway to its original condition. This is a continuing duty in the nature of a covenant running with the land, which will ordinarily pass to the successive owners. "The obligation is not a personal one but attaches to the use of the obstructing

agency and, with the transfer of title thereto, it passes as a continuing condition imposed by operation of law." *City of Indianapolis* v. *Indianapolis Water Co.* (1916), 185 Ind. 277, 113 N. E. 369.

The state, in the exercise of its police power, may require a railroad or the owner and user of a canal which crosses a public highway to erect and maintain a bridge made necessary by reason of the railroad or canal. The state may and has transferred this police power to cities. By granting cities exclusive jurisdiction over its streets the state made the cities governmental agencies of the state for the purpose of protecting the general welfare and safety of the public. This transfer and grant of authority placed a duty upon cities of which they cannot divest themselves by contract or otherwise. As was said in *McKinney* v. *Town of Salem* (1881), 77 Ind. 213, the police power is a "governmental one," and "The right to legislate for the promotion and security of the public safety, morals and welfare cannot be surrendered or bartered away by the Legislature." The latest expression of the supreme court upon this subject is found in *Director General* v. *Nicewanner, Admr.* (1923), 193 Ind. 463, 469, 141 N. E. 1, where the court, in discussing the authority of a city to surrender its power over its streets, said: "The police power to exercise that control over the streets which is necessary to protect the lives and provide for the safety of persons lawfully thereon cannot be surrendered or contracted away."

The city, in settling and compromising the dispute which had arisen with the hydraulic company concerning the pecuniary obligations of one to the other, was exercising a business power, but when it undertook to include in the contract conditions purporting to relieve the hydraulic company from the duty of maintaining the bridge in the future it was not

dealing with property. It was attempting to contract away and limit its power as a governmental agency of the state and to relieve the hydraulic company of a duty required of it under the police power of the state, but, as was said in *Central Union Tel. Co.* v. *Indianapolis Tel. Co.* (1920), 189 Ind. 210, 221, 126 N. E. 628, "the state cannot abdicate or contract away its power to protect the life, the safety, the health, or morals of its citizens."

In *Chicago, etc., R. Co.* v. *State, ex rel.* (1902), 158 Ind. 189, 63 N. E. 224, the court, in discussing the statutory duty of a railroad to restore highways to their former state of usefulness, quoting from *Evansville, etc., R. Co.* v. *Crist* (1888), 116 Ind. 446, 19 N. E. 310, said: " 'The statute prescribes a plain duty. Indeed, the duty existed independent of the statute, but the statute makes it all the more clear and positive. The right to interfere with a highway is coupled with the duty to make it as safe as it was before it was disturbed, or, at least, to use reasonable care and skill to do so. This duty is violated if there is a failure to restore it to its former condition, in all cases where the exercise of reasonable care and skill can effect a restoration.' " And continuing, the court says, "It being the duty of a railroad under the statute at all times and under all circumstances to keep the highways, where they are crossed by the railroad, in such condition and state of repair as not to impair their usefulness, nor interfere with their free use, and so as to afford security for life and property, if this cannot be done by a grade crossing, the company must do it by carrying its tracks either over or under the highway, or the highway over or under its tracks. The duty of restoring and maintaining the free and safe use of the highway includes whatever is necessary to accomplish that object, which is rendered necessary by reason of the construction of the railroad."

*Vandalia R. Co.* v. *State, ex rel.* (1906), 166 Ind. 219, 76 N. E. 980, 117 A. S. R. 370, was an action in mandamus by the state on the relation of the city of ██ South Bend, to compel the railroad to open, plank and make safe and covenient for travel the crossing of a certain street over its right of way. The railroad, in its return to the alternative writ, inter alia, alleged that in 1901 a good faith controversy had arisen concerning the legality of the proceedings relating to the laying out and establishing of the street and that for the purpose of settling and adjusting the conflicting claims, the city and the railroad company entered into a contract whereby the railroad agreed to construct a viaduct over its tracks at the alleged street, and the city agreed to construct the approaches and that when completed the city should "maintain and keep in repair said approaches and said viaduct for all time." In holding the contract void, the court, at pp. 231, 232, said: "The power of the city to make this contract is in nowise affected by the circumstance that the agreement was the result of a compromise and settlement of an existing controversy. . . . Municipal corporations of this State are given exclusive control over their streets and alleys. This authority is conferred for the benefit of the public, and from it arises a continuing duty on the part of the city to exercise legislative control over its streets and alleys at all times and places when demanded by the public good. A municipal corporation has no power, by contract, ordinance or by-law, to cede away, limit or control its legislative or governmental powers, or to disable itself from performing its public duties. . . . If the contract relied upon by appellant is valid its obligations are secure against impairment, not only by the city of South Bend, but also by the legislature itself; and the viaduct, once constructed, must be maintained by the city to the end of time, and the company

and its successors be forever relieved of all duties now owing or hereafter to be imposed on account of the grade crossing. It is not at all improbable that the future policy of the state and the safety and convenience of the people may require the elevation or lowering of railroad tracks through cities and populous districts, and the preservation of ordinary highways upon natural grades free from obstructions. It is impossible to anticipate the changes which in the future may be found expedient, and the police regulations which may become necessary at this particular crossing. The viaduct contract in question provides for single maintenance by the city, instead of joint maintenance by both the parties, and it purports to bind the city and to limit and deny for all time its legislative and police control over this part of the street. That these provisions of the agreement are unauthorized and invalid is not only approved by reason and sound policy, but well supported by authority."

And in *Grand Trunk, etc.*, v. *City of South Bend* (1909), 174 Ind. 203, 209, 89 N. E. 885, 91 N. E. 809, the court said: "The legislature, primarily, has control over streets, as well as other public highways. They are the arteries of the State. . . . And this governmental power of control cannot be surrendered or contracted away. It is a part of the police power which cannot be alienated or placed beyond municipal control. . . . But the legislature may delegate to a city or town the power of control over its streets." And in holding that a person dealing with a city council must take notice of the powers of such council, on page 213. the court quotes from *Board of Education* v. *Phillips* (1903), 67 Kan. 549, 73 Pac. 97, 100 A. S. R. 475, as follows: "All parties dealing with a sovereign power, or one of its functionaries in the exercise of governmental power, the subject of which per-

tains to government, do so knowing that it can not contract away the power conferred for self-protection or self-preservation. The rule, therefore, that the legislature can pass no law impairing the obligation of contracts does not apply to parties dealing with a department of government concerning the future exercise of powers conferred for public purposes by legislative acts, where the subject-matter of the contract is one which affects the safety and welfare of the public."

When the interest of the State in the canal was conveyed to the canal company, the duty of erecting and maintaining the bridges in question was placed on the canal company. This was a positive and continuing duty created by the legislature. The canal company could not, except by legislative authority, relieve itself from that duty. The city was given continuing legislative authority over its streets for the preservation of the health, comfort, and welfare of its inhabitants. As was said in *City of Peru* v. *Gleason* (1883), 91 Ind. 566, 575: "It cannot by contract surrender the future exercise of this discretionary power. The powers of the municipal corporation over its streets are held by it in trust, to be exercised for the public benefit on all proper occasions. They cannot by contract be abandoned or impaired for the benefit of private persons."

If the contract in question is valid, it constitutes a bargaining away of a right given to the city, to be constantly exercised for the welfare of the city. It is difficult to see what changes the future may demand and require. Suppose that some time in the distant future public safety and public welfare require that an overhead bridge or viaduct be constructed so as to carry Seventh and Eighth streets over the tracks of the railroad and over the canal, could it be successfully claimed that the contract in question would prevent the legisla-

ture or the city from requiring the construction of such a bridge at the expense of the railroad and hydraulic company. The agreement between the city and the hydraulic company was, on the part of the city, an unwarranted surrender of legislative power and control over the crossing, and as said in *Vandalia Ry. Co.* v. *State, ex rel., supra* (p. 233), "an unauthorized assumption of the burdens of another, and is invalid and void."

In *State, ex rel. St. Paul* v. *Minnesota, etc., Ry. Co.* (1900), 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656, the railroad claimed a grant of perpetual immunity, from its otherwise binding obligation to keep a bridge in repair, by virtue of a contract with the city wherein the city agreed to maintain the structure "for all future time." The bridge there involved was built at an expense of about $98,000 to the railroad, and of about $25,000 to the city. It was held that where the duty rested upon a railroad to restore a public way to its former condition of usefulness, a city could not enter into a valid contract with the railroad whereby it surrendered its power to compel the performance of such duty; that it could not contract with the railroad that it would maintain such bridge "for all future time"; that such a contract on the part of the city was beyond the power of the municipal officers and was against public policy and of no effect. This case was cited with approval by the Supreme Court of this state in the Vandalia case, *supra.* As was said in *State, ex rel. City of St. Paul* v. *Great Northern R. Co.* (1916), 134 Minn. 249, 158 N. W. 972, 974, "this contract clearly attempted to take from the city a part of its police power and was unquestionably void."

In *Northern, etc., Ry. Co.* v. *Minnesota, ex rel.* (1908), 208 U. S. 583, 52 L. Ed. 630, the city of Duluth contracted with a railroad concerning the building of a viaduct to carry the railroad over a street, the railroad

company contributing $50,000 to the expense of the work. The city agreed to maintain the part of the bridge over the railroad right of way for a period of fifteen years, and to perpetually maintain the approaches. The city built the bridge at a cost in excess of the $50,000 paid by the railroad company. The viaduct and the approaches became dangerous for public use within the fifteen-year period and the city, acting under the law giving it power to require railroad companies to construct bridges and viaducts at their own expense at public crossings, prepared plans and passed a resolution requiring the railroad to repair the viaduct and approaches. The railroad refused to make the repairs. The city prosecuted an action in mandamus. A judgment requiring the railroad to make the repairs was affirmed in *State, ex rel., v. Northern, etc., Ry. Co.* (1903), 98 Minn. 429, 108 N. W. 269, as well as by the Supreme Court of the United States on appeal. The latter court, in *Northern, etc., R. Co. v. State, ex rel.* (1908), 208 U. S. 583, 52 L. Ed. 630, in answer to the contention that the resolution impaired the obligations of the contract and that it was for that reason void, held that the railroad charter, as well as the common law, required the railroad to construct and maintain suitable crossings at streets, and that any contract limiting the exercise of legislative power in that regard was void as against public policy, although there may have been some doubt when the contract was made as to what the rights of the parties were, and the contract may have been a compromise. After stating that it had been uniformly held by that court that the police power was a continuing one that could not be contracted away, quoting from *New York, etc., R. Co. v. Bristol* (1894), 151 U. S. 556, 567, 38 L. Ed. 269, 272, 14 Sup. Ct. Rep. 437, 440, where the court said: "The governmental power of self-protection cannot be contracted away, nor can the

exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulations in particulars essential to the preservation of the community from injury."

In *Bowers* v. *City of Taylor* (1929) (Tex.), 16 S. W. (2) 520, the city undertook to enter into a contract with a railroad to the effect that the city would close a certain street crossing for the exclusive use of the railroad for a period of fifteen years, in consideration of the removal of certain sidetracks across another street and the opening of a new street across such tracks. In holding the ordinance and contract void, the court said: "A city cannot use its delegated power to close any of its streets in such a way as to disable it from exercising the power to open, extend, and widen any street when the public convenience requires it. The principle is well settled that a city cannot by contract or otherwise surrender its governmental or legislative functions, nor can it legally enter into any contract which will embarrass or control its legislative powers and duties or which amount to an abdication of its governmental function or its police power."

In *Florida, etc., R. Co.* v. *Miami* (1918), 76 Fla. 277, 79 So. 682, 1 A. L. R. 303, a contract between a city and a railroad company whereby the latter, in consideration of the city bearing the expense of putting in, operating and maintaining a street crossing, granted the city a right of way over its property for such street, it was held not a bartering or contracting away of the police power of the city, two of the five judges dissenting. The prevailing opinion was founded upon the fact that when the contract was entered into, no street was in existence at the point in question and that until the railroad granted the city the right to cross there was no traffic to regulate; that the railroad, prior to making the contract, owed no duty to the city and the city had

no rights to be surrendered by the contract. In distinguishing *Northern, etc., R. Co.* v. *State, ex rel., supra,* the court said: "In that case the obligation of the railroad company existed before the contract or compromise agreement was entered into. The obligation to construct viaducts over its tracks and keep them in repair was a pre-existing one. . . . When the city of Duluth made the contract to pay part of the expense of building the viaduct and to maintain for fifteen years the part of the bridge over the railway's right of way, and perpetually maintain the approaches, it already had the power to require the railroad to bear all of this expense, and it contracted away an existing power and obligation to the public." This Florida case is in harmony with *City of Indianapolis* v. *Indianapolis Water Co., supra,* where the court, on page 296, said: "The weight of authority, however, seems to be that 'in the absence of statute a railroad company cannot be required to construct and maintain crossings where a street or highway is made across its right of way after the construction of the railroad, there being no common law duty on the part of the railroad company in such cases to construct crossings or bridges or approaches thereto.'" In the instant case, when the city of Connersville and the hydraulic company entered into the contract whereby the city agreed to release the hydraulic company from all future claims for the building and repairing of the bridges, the hydraulic company was under a continuing duty to maintain the bridge and the city had the power to require it to maintain them, and it attempted to contract away an existing power and obligation to the public.

Our attention has been called to *Ward* v. *Erie R. Co.* (1915), 167 App. Div. 950, 154 N. Y. S. 94. The Appellate Division of the Supreme Court, in affirming this cause in a very short opinion stated its conclusion as follows: "1. That the contract by which the burden

of constructing and maintaining the viaduct carrying the street over the railroad tracks was apportioned between the railroads and the city was entered into pursuant to competent authority conferred by legislative enactment. *People, ex rel. Simon* v. *Bradley* (1913), 207 N. Y. 602, 101 N. E. 766. 2. Whatever doubt existed as to the validity of the maintenance clause in question was removed by the act of the legislature which ratified all such contracts. Laws 1911, ch. 358, p. 815." *Ward* v. *Erie R. Co.* (1915), 167 App. Div. 950, 154 N. Y. S. 94. The contract there involved was authorized by the legislature and, as stated by the court in 87 Misc. Rep. 365, 149 N. Y. S. 717, 727, was "in harmony with the law." Inasmuch as the contract under consideration in the instant case was never authorized nor ratified by the legislature, the New York case is of no controlling influence. And we hold that the contract between the City of Connersville and the hydraulic company, insofar as it attempted to relieve the latter company from the future cost and expense of maintaining the bridges, is void. The court did not err in any of its rulings on the demurrers. As was said in *State, ex rel.*, v. *Great Northern R. Co.* (1916), 134 Minn. 249, 158 N. W. 972, 974, "this contract clearly attempted to take from the city a part of its police power and was unquestionably void." To same effect see *Chicago, etc., R. Co.* v. *Nebraska* (1898), 170 U. S. 57, 18 Supt. Ct. 513, 42 L. Ed. 948, affirming 47 Neb. 549; *Gale* v. *Village of Kalamazoo* (1871), 23 Mich. 344, 9 Am. Dec. 80; *State, ex rel.*, v. *Minnesota, etc., R. Co.* (1900), 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656; *Pearson* v. *Twohy Brothers Co.* (1924), 113 Ore. 230, 231 Pac. 129, 36 A. L. R. 1113; *Carolina & N. W. Ry. Co.* v. *Town of Lincolnton* (1929), 33 Fed. (2d) (C. C. A.) 719; *City of Buffalo* v. *Stevenson* (1913), 207 N. Y. 258, 100 N. E. 798; *Bank*

v. *City of Memphis* (1927), 155 Tenn. 63, 290 S. W. 990; *Schwab* v. *Graves* (1927), 221 App. Div. 357, 223 N. Y. S. 160; *Helena, etc., R. Co.* v. *City of Helena* (1913), 47 Mont. 18, 130 Pac. 446; *American Tobacco Co.* v. *Missouri, etc., R. Co.* (1912), 247 Mo. 374, 157 N. W. 502.

Appellant railroad, by mesne conveyances from the canal company, is the owner in fee of the real estate formerly owned by the canal company, subject only to the condition that it will not impair the hydraulic power of the canal, nor the right of way to run water through the canal for hydraulic purposes, and also subject to the condition, that, for the protection of the hydraulic power of the canal, it will maintain the embankments thereof, so far as it uses the same, so as not to impair such hydraulic power. We thus see the railroad is under a duty to maintain the canal and to allow the water to flow through the same. While the evidence is to the effect that the bed of the canal could be filled up so as to avoid the necessity of the bridges without interfering with the operation of the railroad, and that the bridges are necessary only because of the use of the canal by the hydraulic company, the railroad, by the covenants in the deed from the canal company, is bound to protect the banks of the canal and to allow the water to flow through the canal. It can not abandon the canal so long as it is used for hydraulic purposes. It is under an obligation to allow the hydraulic company to use the canal. The canal, however, has been kept open at the points where it crosses Seventh and Eighth streets because of the use of the canal by the hydraulic company, and for the accommodation of that company. This being true, the hydraulic company is primarily liable for the cost of maintaining the bridges in question, and the railroad company is secondarily liable for such cost.

The most extended discussion and review of the au-

thorities dealing with the main question involved in this appeal is found in *American Tobacco Co.* v. *Missouri, etc., R. Co., supra.*

The contentions that the court erred in the admission of evidence, in giving and refusing to give certain instructions and that the verdict is not sustained by sufficient evidence, present no reversible error.

Affirmed.

## ON REHEARING.

McMAHAN, J.—Appellants insist there is no evidence to show that either Seventh or Eighth streets was in existence when the canal was constructed. The evidence discloses that in 1819, the owners of three adjoining tracts of land laid out and platted the same. These plats indicated the dedication of certain streets and alleys, one of such streets being marked Maple Street and another Mill Street. Maple Street is now known as Seventh Street and Mill Street is known as Eighth Street. These plats were recorded in 1819, and on their face indicate that the land so platted was in the then town of Connersville. The owners of the land so platted, thereafter, but before the canal was constructed, sold a large number of the lots as platted, to divers persons, the deed in each instance making reference to the recorded plat. The evidence does not show to a certainty when the canal was constructed across the streets in question, although the inference might be drawn that it was in the latter part of 1838. On June 27, 1840, Hiram Williams and Mathew Vandergrift wrote a letter to the canal commissioner reciting that they had purchased certain lots in the town of Connersville in 1838, and that part of these lots had been taken by the canal, and asking for the appointment of some one to assess their damages. Damages were awarded them under date of September 29, 1840. On November 10, 1838, Philip Mason filed a claim for damages on

account of the taking of his lots between Maple and Mill streets for the location and construction "of the canal now in process of construction through said lots." Other claims for damages were filed in 1840, and one relinquishment of claim for damages was filed on July 24, 1838. The conclusion might be drawn that the canal was in process of construction on November 10, 1838, when Mason filed his claim for damages. It was about this time or a little later that the State stopped construction work on the canal. This case was tried in 1927, and no witness testified as to the condition of the streets in question in 1838, nor is there any evidence as to when the bridges were first constructed over the canal where it crosses these streets.

In 1849, the town of Connersville caused a plat to be made, which showed the several subdivisions and plats of land which had theretofore been recorded. This plat shows the location of the canal across the streets in question and indicates that at that time there was a bridge across the canal on Eighth Street. There is nothing on this plat indicating a bridge at Seventh Street. James M. Heron, who was 70 years old, testified that his earliest recollection was when boats were running on the canal. Thought he was seven or eight years old when the canal company quit business and the railroad constructed, and that when the change was made the bridges were lowered considerably. There used to be high bridges over the canal. Before the railroad took possession, the bridges had stone foundations on each side of the canal and were high enough for the boats to pass under and have plenty of room to ply between the top of the boat and the bridge; was not positive as to whether there were bridges on Seventh and Eighth streets at that time. In order to build the railroad on the tow-path, they had to remove the bridges and put in others. Did not know who made the changes. Alonzo

Cooley was born in Connersville in July, 1847. His impression was that there were bridges over the canal on Seventh and Eighth streets before the railroad was built. When the railroad came, the bridges were changed and the ground levelled down. The bridges were eight to ten feet high. The approaches to the bridges came up and resembled a small hill. The old bridges were ordinary lumber bridges. When put back, the bridges were shortened. He was raised between Sixth and Seventh streets, which was about the center of town. He was fourteen or fifteen years old when the bridges were changed.

James Downs was born in January, 1849. He began driving a team on the canal in 1864. His recollection is that there were bridges on Seventh and Eighth streets before the railroad was built. The tow-path was on the east side of the canal and the bridges were high enough for a mule to go under. Supposed that the company that ran the canal changed the bridge. He also said he thought the city made the changes in the bridges, and later said the railroad took the bridges down.

L. L. Broaddus, who was one of the attorneys for appellant railroad, was born in 1856 and remembered the canal when it was in the possession of the canal company. Knew the Eighth Street bridge before the railroad was constructed. The bridges were operated as canal bridges. After railroad came they were shortened at the east end, leaving room to locate railroad on tow-path. After the railroad began to operate, the wooden bridges remained there until they were worn out. The boards came off the sides. His recollection is that the city and county took the bridges *back* at one time. He had been city attorney and had frequent disputes with the hydraulic company on legal questions. He drafted the contract mentioned in the principal opinion whereby the city undertook to release the hy-

draulic company from the obligation to maintain the bridges. Eighth Street was in the corporate limits of the town when he was a boy. The records show that Seventh and Eighth streets were opened as streets prior to 1830.

Appellant railroad company, in its answers and cross-complaint, admits that in December, 1865, the White Water Valley Railroad purchased the bridges on Seventh and Eighth streets from the canal company and acquired title thereto so that the bridges could be removed, lowered and shortened and the railroad constructed at grade. It alleges that said original bridges were thereafter abandoned, and that in their place the city constructed and maintained other and newer bridges of concrete and iron. And in this connection it is to be observed that the only bridges constructed by the city, so far as the evidence discloses, are the two which were constructed in 1915, and which are the subject of this action.

It thus appears that in 1865, the canal company as owner of the old bridges on Seventh and Eighth streets sold and conveyed them to the railroad company; that the latter company, acting upon the assumption that the canal company had the right to sell them and that it became the owners of such bridges, took possession of them, lowered and shortened them, and rebuilt them across the canal. The canal company and the railroad, at that time, were certainly advised as to who owned these bridges. These bridges had theretofore been used as "canal bridges," and the assertion of ownership by the canal company and by the railroad company is sufficient to sustain a finding that those companies at that time understood they were under an obligation to maintain the same as property formerly owned by the canal company.

It seems clear to us that the evidence is ample to sustain a finding that Seventh and Eighth streets were opened and used as existing highways when the canal was constructed, and that the canal company and the railroad company, by their acts, so recognized them, as well as their liability to maintain them.

The court, at the close of the evidence, instructed the jury to return a verdict for the plaintiff. Ordinarily this would have amounted to reversible error. But not so in the instant case. At the close of the evidence, the hydraulic company and the railroad company each tendered an instruction asking that the court instruct the jury to return a verdict for each of them. These requests were denied and the plaintiff filed its request asking that the court instruct the jury to return a verdict in its favor. This request was granted and the jury was so instructed. The parties, by so requesting the giving of the binding instructions, put the question as to the right of the plaintiff to recover up to the court, and was equivalent to withdrawing the case from the jury. The court so interpreted the acts of the parties, but instead of dismissing the jury and making a finding of its own, the court instructed the jury to return a verdict for the plaintiff. This the court had a right to do, and its action in that matter was not error. See *Continental Casualty Co.* v. *Klinge* (1924), 82 Ind. App. 277, 144 N. E. 246; *Goings* v. *Davis, Director* (1923), 82 Ind. App. 231, 141 N. E. 473.

Rehearing denied.